Pete D. ARVIZU et al.

v.

WACO INDEPENDENT SCHOOL
DISTRICT et al.

Patricia Ann BAISEY et al.

v.

The BOARD OF TRUSTEES OF the
WACO INDEPENDENT SCHOOL
DISTRICT et al.

Nos. W–71–CA–56, W–71–CA–72.

United States District Court,
W. D. Texas,
Waco Division.

April 27, 1973.

Supplemental Opinion and Order
July 30, 1973.

Guadalupe Salinas, John E. Serna, San Antonio, Tex., Mario G. Obledo,

Alan B. Exelrod, San Francisco, Cal., for Pete D. Arvizu et al.

Minor L. Helm, Jr., Waco, Tex., for Waco Independent School Dist. and Bd. of Trustees of Waco Independent School Dist. et al.

John W. Walker, Little Rock, Ark., Sylvia Drew, New York City, New York, for Patricia Ann Baisey, et al.

## MEMORANDUM OPINION AND ORDER

ROBERTS, District Judge.

These desegregation suits have been brought by private black (Baisey, et al.) and Mexican-American (Arvizu, et al.) plaintiffs against the Waco Independent School District (WISD) and its Board of Trustees. The cases have heretofore been consolidated by this Court and were heard as a single cause during the nearly two weeks of presentations by the parties. This Court having heard all evidence, testimony, stipulations and argument presented by the parties, now sets forth its findings of fact and conclusions of law in this Memorandum Opinion and Order.

## I. DISCRIMINATION AS TO BLACKS

Before Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873 (1954), and for several years therafter, the WISD operated a racially segregated dual school system. The first formal recognition by the WISD of its legal obligation to dismantle its old dual school system came in June 1963, with the reading of a desegregation statement at a meeting of the Board of Trustees. In the early 1960's a lawsuit was filed to compel desegregation of the WISD. The resulting Order, McGrue v. Williams, Civil Action No. 2291, (W.D. Texas, Dec. 2, 1964) established a plan for the gradual termination of official imposition of a dual school system in Waco.

We are now, over eight years later, presented with the question whether the

efforts of the WISD have been sufficient to meet its "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which discrimination would be eliminated root and branch." Green v. County School Board of New Kent County, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1694, 20 L. Ed.2d 716 (1968). We are compelled to hold that the WISD has not yet become a unitary school system. The vestiges of segregation can still be found all to often in the WISD. Most black students continue to attend racially identifiable black schools. Those schools continue to be racially identifiable not only by their student bodies, but also commonly by the race of their principals and the predominance of black teachers and staff. Certain school facilities historically identifiable as black facilities continue in their racial identifiability. Moreover, the facilities of minority-dominated schools are often under utilized, while predominately white schools are frequently overcrowded.

During the Court-ordered desegregation plan of 1964–1969, the WISD took no affirmative steps to desegregate the school system in any meaningful way. Since 1964, no black school has lost its racial identifiability and no facilities have been fully desegregated. The school system has not, in short, been rid of the vestiges of segregation.

[The WISD presently employs basically a "neighborhood school" concept with a "freedom of choice" type of transfer policy, whereby students may transfer to any school which is open for additional enrollment.] [With the limited exception of black students from the La Vega area who are transported to predominantly white schools, and students in the other areas who are transported by bus for safety reasons, no free transportation is provided students who wish to transfer into schools outside their neighborhood zone.]

At the beginning of the 1972–1973 school year the racial composition of students in the WISD was:

| | | |
|---|---|---|
| Anglo | 10,774 | 58.3% |
| Black | 5,261 | 28.4% |
| Mexican-Americans | 2,470 | 13.3% |

Of the 35 schools operated by the WISD, 15 are predominantly (over 50%) minority (black and Mexican-American) schools. Of these, all are over 60% minority, and 7 of the 15 are made up of over 90% minority students.

At the beginning of the 1972–1973 school year, 59.5% of the black students in the WISD attended identifiably black schools. Specifically, the following schools appear to be racially identifiable black schools:

| High Schools | % Black |
|---|---|
| Jefferson-Moore | 87 |
| **Jr. High Schools** | |
| South | 46 |
| West | 51 |
| Wiley | 99 |
| **Elementary Schools** | |
| Brook Avenue | 78 |
| Hines | 98 |
| Nalley | 74 |
| Oakwood | 100 |
| Sanger Avenue | 46 |
| Smith | 99.2 |

Of these ten racially identifiable black schools, five were denominated as "colored" schools in the old dual school system of the WISD: Hines, Oakwood, Smith, Wiley and Moore (predecessor to Jefferson-Moore). The only conclusion we can draw from the above described evidence and statistics is that Waco simply has not converted its segregated dual school system into a unitary one. The freedom of choice transfer policy of the WISD (under which free transportation is not generally available) has been unequivocally rejected by the Supreme Court where it is not effective to dismantle the old dual school system. Green v. County School Board of New Kent County, supra; Monroe v. Board

of Commissioners of the City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). [Likewise, a "neighborhood school" system, appearing on its face to be neutral, is unacceptable where it fails to "counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation."] Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971). The WISD has failed, as to the above described racially identifiable black schools, to rebut the "presumption against schools that are substantially disproportionate in their racial composition," Swann, 402 U.S. at 26, 91 S.Ct. at 1281. The conversion of the WISD to a unitary school system necessarily requires that the ten presently identifiable black schools in the Waco school system be divested of their racial identifiability, and that the black and white students of Waco be assured the constitutionally guaranteed benefits of an education not tainted by the vestiges of State-imposed segregation.

## II. DISCRIMINATION AS TO MEXICAN-AMERICANS

The formulation of an appropriate legal framework for analyzing the status of Mexican-American students is a task not free of difficulty. Our uncertainty regarding the Supreme Court's disposition of Keyes v. School District No. 1, 445 F.2d 990 (10th Circuit 1971), cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972), and our attempt to understand and apply properly and consistently with pre-existing Supreme Court precedent, the Fifth Circuit's analysis in Cisneros v. Corpus Christi Independent School District, 467 F.2d 142 (5th Cir. 1972) and United States v. Texas Education Agency (Austin Independent School District), 467 F.2d 848 (5th Cir. 1972), have rendered the question subject to legitimate dispute. We believe, however, that a proper legal analysis of the status of the Mexican-American student should basically follow the approach set out herein.

Five schools in the Waco School system appear to have disproportionately large numbers of Mexican-American students:

| Junior High Schools | % Mexican-American |
| --- | --- |
| South | 31% (with 46% Black) |
| **Elementary Schools** | |
| Bell's Hill | 57% (with 7% Black) |
| Gurley | 44% (with 4% Black) |
| South Waco | 54% (with 33% Black) |
| Sul Ross | 50% (with 34% Black). |

■ The Fourteenth Amendment, of course, prohibits segregation in public schools resulting from state action. As the Fifth Circuit has noted, two distinct factual determinations are required to support a finding of unlawful segregation: "First, a denial of equal educational opportunity . . ., defined as racial or ethnic segregation. Secondly, this segregation must be the result of state action." Cisneros, supra at 148 of 467 F.2d.

There can be no gainsaying the fact that many Mexican-American students attend the five schools with disproportionate numbers of Mexican-American students. Our calculations indicate that approximately 35.6% of the Mexican-American students in Waco attend these disproportionately Mexican American schools. Another 12.6% of Waco's Mexican-American students attend the ten racially identifiable black schools.

■ Indisputably, this concentration of Mexican-Americans in certain schools is the result of residential housing patterns. Mexican-American citizens and students are most heavily concentrated in South Waco. Plaintiffs do not seriously contend that state action created the pattern of residential concentration of Mexican-Americans, and Plaintiffs concede that no history of statutorily imposed segregation of Mexican-Americans can be shown in this case. Our inquiry cannot stop here, however. We fully recognize that state action may be shown through governmentally sanctioned discrimination in the laws or official practices of the community under consideration. Likewise,

state action may be shown by the "rigid superimposition of a neighborhood school plan upon the historic pattern of marked residential segregation," where that plan produces "inevitable segregation." Cisneros, supra at 149.

█ █ [Absent a history of statutorily-imposed segregation of Mexican-Americans, the presumption of discrimination disappears, and each case involving alleged discrimination against Mexican-Americans must be determined on an *ad hoc* basis.] Unlawful discrimination in the form of gerrymandered school districts, school plans producing "inevitable segregation," and inferior school facilities undoubtedly exists in many cases, but such discrimination cannot be presumed from the mere fact of segregation without state action. We should remember that the Supreme Court's declaration in Brown, "separate educational facilities are inherently unequal," supra at 495, of 347 U.S. at 692 of 74 S.Ct., was made in the context of a history of decades of official discrimination against blacks. Such a history of discrimination properly created a presumption that segregation of black students was a denial of equal protection of the laws. The Mexican-American Plaintiffs in this case have failed to show the necessary history of official discrimination or official acts with the inevitable consequence of creating segregation to justify a finding that the concentration of Mexican-American students in certain schools is the result of state action. Plaintiffs have failed to show that school zones have been gerrymandered, that schools have been located in such a way as to foster separation, or that a rigid neighborhood school plan has been superimposed upon a historic pattern of residential segregation to produce "inevitable segregation." The situation in Waco is, rather, one of gradually shifting residential patterns of Mexican-American concentration superimposed upon essentially unchanging school boundaries.

Our obligation to assure to the Mexican-American Plaintiffs in this case the equal protection of the laws does not end with our finding that such segregation of Mexican-Americans as does exist in Waco is not the result of state action. Mexican-Americans in Waco constitute an identifiable ethnic minority, recognizable by their numbers, concentration, cultural uniqueness, and common special needs and problems. We find that Mexican-American students in Waco constitute "an identifiable, ethnic-minority class entitled to the equal protection guarantee of the Fourteenth Amendment." Cisneros, supra at 149, of 467 F.2d. As such, Mexican-American students are entitled to proper implementation of steps necessary to assure them the equal protection of the laws and an equal educational opportunity.

Although we find that the isolation of Mexican-Americans in Waco is not the result of the past state action, our finding that Mexican-Americans in Waco are an identifiable ethnic class with special educational needs does impose upon the WISD an affirmative obligation to assure that Mexican-American students are assured the equal protection of the laws in the future. We conclude that, as an identifiable ethnic group, Mexican-Americans in the WISD are entitled to:

1. Protection against future official discrimination of any form.

2. Consideration in the selection of future school sites, as required by Swann, supra at 21 of 402 U.S., 91 S.Ct. 1267, and United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966), to assure that the location of future schools does not further lock the school system into the mold of separation of races and ethnic groups.

3. Protection against being classified as "whites" for purposes of desegregating racially identifiable black schools.

4. Separate consideration in all plans regarding future recruitment and hiring of faculty, staff, and administrators, and in the assignment of teachers.

5. Implementation of a curriculum and special educational programs, such as bilingual education, necessary to pro-

vide equal educational opportunities for Mexican-American students as a group.

This analysis is, we feel, a proper one in that it recognizes not only the status of Mexican-Americans in the Southwest as an identifiable ethnic group, but also the differences between the historic legal treatment of blacks and Mexican-Americans. This approach, in essence, protects Mexican-Americans against future discrimination occurring after the recognition of their new legal status in Cisneros and the Austin case, while recognizing that the past failure of school officials to foresee Cisneros, and thus provide affirmative desegregation relief, was not tantamount to discrimination. Future failure of school officials to provide the required affirmative relief should, of course, be regarded as state action with a foreseeable discriminatory effect.

The plan to be submitted to this Court pursuant to this Memorandum Opinion and Order must be prepared and considered in view of the school district's affirmative obligation to assure to Mexican-American students the equal protection of the law. We would particularly draw the attention of the parties to points 2 and 3 above. All too often, the practical effect of the "desegregation" of school systems has been that black students are mixed with Mexican-American students, thus denying to both groups the benefit of any meaningful desegregation. Schools with substantial Mexican-American populations cannot be made to carry a disproportionate share of the burden of desegregation. Moreover, the plan to be submitted to the Court, as well as all future selection of school sites and drawing of school boundaries, must recognize the school district's legal obligation to promote, rather than retard, the racial and ethnic diversity of students in all schools of the WISD.

Despite the widespread scarcity of qualified Mexican-American teachers and educators, we recognize that the WISD has begun efforts to implement points 4 and 5 above, through its attempts to recruit more Mexican-American teachers and development of a bilingual educational program for Mexican-American students. This beginning is a sign of good faith on the part of school officials. We can only reiterate the consistent position of WISD officials: These efforts are only a beginning, upon which future more sophisticated and more comprehensive programs must be built. "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." Brown, supra at 493 of 347 U.S., at 691 of 74 S.Ct. Development of a curriculum and special programs to assure that Mexican-American students will receive an equal opportunity for a quality education is both an educational and a legal obligation of the school district.

### III. FACULTY, STAFF AND ADMINISTRATION

■ We find that the number of Mexican-American teachers in the WISD does not fairly reflect the ethnic composition of students in the systems. In order to afford the black Plaintiffs the remedial relief to which they are entitled, and to assure the Mexican-American Plaintiffs the protection to which they are entitled, faculty composition must fairly reflect the ratio of black and Mexican-American students to the total scholastic population of the district. As to qualified black teachers we foresee no difficulty, as substantial numbers of black teachers are already employed by the WISD. We recognize the district's commendable efforts to obtain qualified Mexican-American teachers. These efforts must be continued, with the goal of a ratio of Mexican-American teachers to total faculty that approaches the ratio of Mexican-American students to the total student population. In the recruitment of these teachers, "The school board need not, of course, lower its em-

ployment standard." United States v. Texas Education Agency (Austin Independent School District), supra.

■■ Furthermore, black and Mexican-American teachers must not be limited to assignments within their own race or ethnic group. While a racial ratio or "quota" in each school is improper as to students, one is proper and may be required as to teachers. See Swann, supra at 19 of 402 U.S., 91 S.Ct. 1267; United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S. Ct. 1670, 23 L.Ed.2d 263 (1969).

■ We note the historic absence or under-representation of blacks and Mexican-Americans among the administrative personnel of the WISD. We cannot, of course, judge the qualifications of each applicant for administrative positions. We can and do, however, require that the school district develop a systematic method of notifying eligible potential applicants of administrative openings, and promulgate a set of job requirements and criteria of evaluation which are demonstrably nondiscriminatory. The plan submitted to this Court pursuant to this Memorandum Opinion and Order shall include these points.

## IV. SPECIAL SCHOOLS

■ Plaintiffs complain of the disproportionate number of black students at two special schools: Dripping Springs (kindergarten) and Kirk-Wilson (special education for mentally retarded). In developing their plan pursuant to this Order, school district officials shall note their obligation to follow these guidelines: 1. If a kindergarten program is to be provided, it must be "made available to all on equal terms," Brown, supra at 493 of 347 U.S., at 691 of 74 S.Ct., as part of a unitary school system. 2. When standardized tests are used to classify or place students, the school district must take steps to assure, as far as possible, that these tests contain no bias against any cultural, racial, or ethnic group. 3. When educable mentally retarded children are assigned to classes of predominantly non-retarded children, these assignments must not place the burden of such mixing disproportionately upon any racial or ethnic group.

## V. BUILDINGS AND FACILITIES

■ This Court can, of course, do nothing to alter the location or age of existing schools. As to the maintenance of buildings and distribution of equipment, we cannot say on the basis of the record before us that the Defendants have engaged in any pattern of discriminatory conduct. We recognize that because of the consistent westward migration in Waco, black and Mexican-American students commonly are left behind to attend older schools in poorer areas of town. We anticipate that the conversion of the WISD to a unitary school system will alleviate much of this inequity, and expect that "normal administrative practice should produce schools of like quality, facilities, and staffs." Swann, supra at 18–19 of 402 U.S., at 1277 of 91 S.Ct.

Moreover, we are obligated to assure that the location of future schools does not further lock the school system into the mold of separation of races and ethnic groups. See Swann, supra at 21, 91 S.Ct. 1267; United States v. Jefferson County Board of Education, supra. To this end, this Court may find it necessary to retain jurisdiction even after the implementation of the school plan to be submitted pursuant to this Order.

## VI. THE REMEDY

■ This Court having heard all evidence, testimony, stipulations and argument presented, and having made its findings of fact and conclusion of law herein, must now proceed to fashion a remedy to eliminate the dual school system as it has existed in Waco and to protect the interest of the identifiable ethnic minority of Mexican-American students during the course of this dismantling of the dual school system. We recognize that "it is the duty of the school officials to forthwith formulate and implement such student assignment

plan as will remedy the discrimination which has been found to exist." United States v. Texas Education Agency (Austin Independent School District), supra. Consequently, we direct Defendants to prepare for submission to this Court a comprehensive plan to fulfill their legal obligations as set forth in this Memorandum Opinion and Order. In preparing this plan, Defendants shall consult and confer with attorneys for Plaintiffs, in an effort to formulate a plan which the parties agree will guarantee the legally protected interests of Plaintiffs, without casting an undue or unrealistic burden upon Defendants. This plan shall be submitted to this Court no later than June 1, 1973.

▪▪▪▪ In developing a student assignment plan as part of the overall plan to be submitted, school officials are directed to follow the procedures heretofore set forth by the Fifth Circuit in United States v. Texas Education Agency (Austin Independent School District), supra (Bell, J., specially concurring):

1. Where a strict neighborhood school system will eliminate discrimination, that is sufficient. But where a neighborhood basis for assignment will not suffice, other methods of desegregation must be employed.

2. Where possible, schools in close proximity should be paired, or clustered, school zones realigned, and portable school rooms relocated.

3. If no other possible remedy which would not involve increased student transportation is effective, schools in noncontiguous zones should be paired or clustered in such a manner to minimize student transportation requirements. The length of time for travel, age of the children, risk to health, and impingement of the educational process must be considered. The school board and Court must avoid casting the burden of desegregation disproportionately on either black or Mexican-American students.

4. Any particular degree of racial balancing will be disapproved, though racial balance may be utilized as an interim corrective measure. In this connection this Court notes that racial percentages in schools are obviously an important factor in determining whether a school system has been desegregated but we do not expect, and would not approve, any effort to compel a strict mathematical racial balance in every school of the system.

5. An overall amelioration of any possible discrimination will tend to be accomplished by the use of a majority to minority transfer policy, with free transportation provided. A tri-ethnic committee in the school district may be created to foster use of this majority to minority transfer plan.

We have attempted in this Memorandum Opinion and Order to set forth the areas requiring special attention by Defendants in their efforts to formulate a comprehensive program to eliminate all vestiges of the old dual school system. We have, further, set forth the steps necessary to assure the equal protection of the laws to Mexican-American students. This Court recognizes that the conversion of the WISD to a unitary school system will require good faith efforts and certain sacrifices on all sides. This Court directs the attorneys for all parties to begin immediately a series of conferences, to be arranged by counsel for Defendants, at which the parties shall fully explore the possibility of developing a plan agreeable to all. We wish to emphasize our hope and expectation that school officials will utilize their expertise and familiarity with their own school system to develop a comprehensive plan to implement fully this Memorandum Opinion and Order. This Court has no desire to become a "super school board," and we feel confident that the responsible officials of the WISD will fulfill their legal obligations to the complete satisfaction of this Court.

It is so ordered.

## SUPPLEMENTAL OPINION
## AND ORDER

This cause comes again before the Court for a determination of the adequacy of "Proposed School Plan of the Waco Independent School District," submitted pursuant to the Memorandum Opinion and Order entered by this Court on April 27, 1973. We have reviewed the District's Proposed School Plan with great care, and have concluded that it is an effective desegregation plan which will eliminate all vestiges of the old dual school system in Waco, will fulfill the District's obligation to assure to all students an equal opportunity for qualitative education, and which can be, with the few clarifications set out herein, approved by this Court as a legitimate and proper plan for the operation of a unitary school system.

The District's plan follows the guidelines set out in this Court's Memorandum Opinion and Order, adopted from guidelines set forth in the majority opinion of United States v. Texas Education Agency (Austin Independent School District), 467 F.2d 848 (5th Cir., Bell, J., specially concurring). The plan does, where possible, preserve neighborhood schools. In cases where retention of neighborhood schools was not feasible, the Plan provides for a minimum of student transportation consistent with the goal of conversion to a unitary school system. While a strict mathematical racial balance is not a part of the Plan, every student in the Waco Independent School District (WISD) will attend an effectively desegregated school (except for the 1974 and 1975 graduating seniors at Jefferson-Moore High School, discussed herein). In short, the District's Plan presents a workable method of desegregation which promises to achieve maximum desegregation with a minimum of disadvantages.

Basically, the Plan divides the WISD into four quadrants, drawn around Waco's four public high schools: University, Waco, Jefferson-Moore, and Richfield. Lines for junior high and elementary school zones are drawn within the quadrants, so that students will continue together throughout the educational system, and "feeder" systems maintained. The quadrants can be generally described as follows:

University—includes most of South Waco. It contains the bulk of the Mexican-American population in the District, but fewer blacks than other zones. It will have a slight Anglo majority.

Waco—includes North and Northeast Waco. It will have a substantial Anglo majority, with a number of black students reflective of the number of blacks in the system as a whole.

Jefferson-Moore—includes a belt running through the middle of the city, encompassing the old Jefferson-Moore district in East Central Waco and the predominantly Anglo Crestview area in West Central Waco. Except temporarily, for Jefferson-Moore High School, as discussed herein, all schools will be fully desegregated with a substantial Anglo majority.

Richfield—is the only non-contiguous zone. Northwest Waco (predominantly Anglo) will be paired with the predominantly black J. H. Hines Elementary School zone in East Waco to produce fully integrated schools throughout the zone.

The Plan involves the closing of four previously operating schools and the conversion of six other schools to kindergarten, sixth, or seventh grade centers:

| Closed (% Black) | Converted (% Black) (New grade) |
|---|---|
| University Zone: | |
| Nalley (74%) | Oakwood (100%), kindergarten |
| | Sul Ross (34%), 6th grade |
| | South (46%), 7th grade |
| Waco Zone: | Brook Avenue (78%), 6th grade |
| Jefferson-Moore Zone: | |
| Sanger Avenue (46%) | R. L. Smith (99%), |
| West Junior High (51%) | 6th grade |
| Richfield Zone: | |
| Wiley Jr. High (99%) | J. H. Hines (98%), 6th grade. |

Of the four schools closed, two (Nalley and Wiley Jr. High) are predominantly black schools, and two (Sanger Ave. and West Jr. High) possess racially mixed student bodies, are located in racially mixed neighborhoods, and are not identified in either the black or white community as predominantly or historically black schools. Thus, we have here no impermissible closing of formerly black schools for racial reasons. Cf. Lee v. Macon County Board of Education, 448 F.2d 746 (5th Cir. 1971).

The major difficulty with the Plan is the continuation of junior and senior students from Jefferson-Moore High School at that school. While this means that Jefferson-Moore will not be completely desegregated for two years, the effect of this is somewhat ameliorated by the fact that junior and senior students will attend, on a daily basis, required English and civics classes respectively, at Jefferson-Moore. The District has, in its Plan, concluded that, "The spirit of a school and, in a large measure, its success, is determined to a great degree by the leadership of its outgoing seniors and the enthusiasm of the seniors-to-be." In view of the general good faith efforts of Defendants to create a plan which will eliminate discrimination and convert the WISD into a unitary school system, we defer to the judgment of the School Board on this matter.

Other points of controversy or ambiguity in the Plan have been raised by Plaintiffs. Accordingly, we shall set forth our understanding regarding several of these matters, pursuant to which the Plan is approved by the Court. Jurisdiction is retained by the Court, and the School District is directed to report to the Court semiannually, on or about January 15, and July 15, of each year, regarding the progress of the desegregation plan. Included in these reports shall be: progress regarding recruitment and assignment of black and Mexican-American personnel in the faculty, staff and administration; progress regarding the District's commitment to renovation and maintenance of existing facilities; the status of student desegregation in each school in the District; progress in the development and implementation of special programs of educational enrichment for Mexican-Americans; a report regarding utilization of the District's majority-to-minority transfer option; and any other matters relevant to the success of the District's Plan. In view of these stringent requirements for reporting and the Court's continuing jurisdiction, we consider any requirement of greater specificity in the Plan, as requested by Mexican-American Plaintiffs, to be unnecessary. The ultimate success of the Plan depends largely upon the good faith of the Board. We have seen such good faith exhibited in the drawing of this Plan, and we have every confidence that it will continue. Moreover, any possible disputes regarding implementation of the Plan will, of course, be subject to scrutiny by this Court in the course of its continuing jurisdiction.

Additionally, this Court shall require that prior to any change in school attendance zones and prior to construction by the District of any new school, the Board shall notify counsel for Plaintiffs of such proposal. If, within 30 days, counsel for Plaintiffs have made no objection thereto, the proposal shall be considered approved by this Court. If, within 30 days, objection is made, this Court shall hear and resolve the dispute by approving or disapproving the proposal. It is accordingly

Ordered, adjudged and decreed that the Proposed School Plan of the Waco Independent School District, clarified and modified herein, be, and hereby is, approved. We attach hereto, and incorporate herein, a copy of the Proposed Plan. This Memorandum Opinion and Order shall constitute Findings of Fact and Conclusions of Law.

APPENDIX

I.

STUDENT ASSIGNMENT:

All students will be assigned to schools with reference to a sector of the WISD, designated by the high school which such students will ultimately expect to attend.

A. ELEMENTARY SCHOOLS:

1. UNIVERSITY HIGH SECTOR

All elementary students currently residing in the following elementary attendance zones as now drawn, except where otherwise indicated, will be placed in the University High Sector: Alta Vista, Bells Hill, Gurley, Kendrick, Kirk Wilson, Meadowbrook, Nalley, Oakwood, Sul Ross Elementary Schools. For the 1973–74 school year, Nalley*, Sul Ross*, Kirk Wilson**, and Oakwood**, Elementary Schools will be suspended from operation as regular first through sixth grade elementary schools and those students living in the current Nalley, Oakwood, Kirk Wilson, Sul Ross elementary attendance zones will be assigned to Alta Vista, Bells Hill, Gurley, Kendrick, Meadowbrook and South Waco Elementary schools for grades one through five. All students in the University High Sector will be assigned to Oakwood for the kindergarten instruction, Sul Ross Elementary School for the sixth grade, South Junior High for grade 7, University Junior High School for grades 8 and 9, and University Senior High School for grades 10 through 12.

B. WACO HIGH SECTOR

Those students from Brook Avenue, Cedar Ridge, Lake Waco and North Waco Elementary Schools, together with those students now in the WISD who were formerly in the La Vega Independent School District, in the Dripping Springs—Carver Park A area, will be assigned to the Waco High Sector. The Cedar Ridge, Lake Waco and North Waco students living in those attendance zones currently drawn, unless otherwise indicated will continue to attend their neighborhood schools from grades one through five. The Brook Avenue students, as well as the former La Vega students, designated Carver A, will be assigned to those three elementary schools for grades one through five. All students in the Waco High Sector will attend Dripping Springs for kindergarten instruction, Brook Avenue Elementary School for grade 6, North Junior High for grades 7 through 9, and new Waco High School for grades 10 through 12. Those students currently attending Waco High School in the 10th and 11th grades during the 1972–73 school year will be permitted to continue to attend Waco High School during 1973–74 even if they are not residing in this Sector. The projected enrollment by racial and ethnic background is shown on attached Exhibit B.

C. JEFFERSON-MOORE HIGH SECTOR

Students living in the attendance zones as currently drawn, except where otherwise indicated, from R. L. Smith, Parkdale, Crestview, Provident Heights, Sanger, and Barron Springs for grades 1 through 5 are assigned to the Jefferson-Moore Sector. They will attend Parkdale, Crestview, and Provident Heights Elementary Schools for grades 1 through 5 with those students attending their neighborhood schools where possible. They will all attend R. L. Smith Elementary for grade 6 and Ten-

* Historically White schools

** Historically Black schools
Note: Although 10 schools are suspended from regular multi-grade classroom activities for 1973–74, all but 3 (two white and one black) are utilized as kindergarten, sixth, and seventh grade centers. Kirk Wilson has not been serving as a regular elementary school for some time, but its attendance zone has been maintained.

nyson Junior High for grades 7 through 9. Their high school assignment will be set forth in a separate section of this plan. Sanger Elementary,* West Junior High,* and Barron Springs** will be suspended from their normal school operation for the 1973–74 school year. The projected enrollment by racial and ethnic background is shown on attached Exhibit C.

### D. RICHFIELD HIGH SECTOR

All students living in the J. H. Hines, Dean Highland, Hillcrest, Mountainview, and Viking Hills Elementary Schools attendance zones will be assigned to Mountainview, Dean Highland, Viking Hills and Hillcrest, with those students living in those four zones assigned to their neighborhood schools for grades 1 through 5. Those Carver Elementary students designated as Carver B will be assigned to those four schools, along with those living in the J. H. Hines attendance zone, for grades 1 through 5. All elementary students in the Richfield Sector will be assigned to Dripping Springs for kindergarten instruction, J. H. Hines for grade 6 and to Lake Air Junior High School for grades 7 through 9. The high school assignment will be set forth in a separate part of this plan. G. L. Wiley Junior High School * will be suspended from normal junior high operation for the 1973–74 school year. The projected enrollment by racial and ethnic background is shown on attached Exhibit D.

### E. RICHFIELD — JEFFERSON-MOORE HIGH SCHOOL ASSIGNMENT PLAN

The spirit of a school and, in a large measure, its success, is determined to a great degree by the leadership of its outgoing seniors and the enthusiasm of the seniors-to-be. Any assignment plan which would immediately alter the racial composition of Richfield and Jefferson-Moore High School on a full time permanent basis would uproot a vast majority of the seniors in both schools, cut off the ties they had built up with their own school and deprive the schools of their leadership and, in a large measure, seriously impede any hopes of an orderly transition to a fully integrated high school program. Keeping in mind the goals and objectives of total desegregation and at the same time hoping to achieve it with the maximum orderly transition and a minimum disruption of the educational process, the following program was designed:

All 10th graders residing in the Richfield and Jefferson-Moore Sectors will attend Richfield High School for the 1973–74 school year only. Any 10th grade student attending Richfield during 1973–74 from the Jefferson-Moore Sector who desires to participate in any University Interscholastic League activities, including athletics, drama, speech, band, chorus, etc., must participate in those activities at Jefferson-Moore and their classes must be arranged to afford them time for such participation. All 10th graders attending Richfield who are from the Richfield Sector who desire to participate in University Interscholastic League activities must do so at Richfield High School.

It is felt that the foregoing transition program is essential to the success of the desegregation of WISD at the secondary level and consequently, any agency, or association, including specifically the UIL, which has regulations which could be interpreted to prevent or limit

---

* Historically White schools

** Historically Black Schools
  Note: Barron Springs has not been serving as a regular elementary school for some time, but its attendance zone has been maintained.

* This school was historically a White school, but was changed to a segregated Black school and consequently, would be classified as a Black school.

a student from participating in extra-curricular activities because of class assignment is directed to grant an exception during the time of transition of this desegregation plan.

Those 10th graders attending Richfield High School for the 1973–74 school year from the Jefferson-Moore Sector will be assigned to Jefferson-Moore High School for the 1974–75 school year, as well as all 10th graders residing in the Jefferson-Moore Sector during 1974–75.

All juniors and seniors currently attending Richfield High School will continue to be enrolled at Richfield High School and will be permitted to graduate from Richfield High School. All juniors and seniors at Jefferson-Moore High School will continue to be enrolled at Jefferson-Moore and will be permitted to graduate from Jefferson-Moore.

For the 1973–74 school year, all juniors in both the Richfield and Jefferson-Moore Sectors will be assigned to required junior English courses to be taught exclusively at Jefferson-Moore High School. All seniors from Richfield High School will be assigned to required civic courses to be taught exclusively at Jefferson-Moore High School. All of the classes in English and Civics taught at Jefferson-Moore High School will be established so that the makeup in each such class approximates the racial composition of the District as a whole as near as can be accomplished, taking into consideration the student body population of both schools. The majority to minority transfer program will be available for eligible students who wish to take advantage of it as set forth in paragraph IX herein. The projected racial composition for Richfield and Jefferson-Moore High Schools is set forth in the attached Exhibit "D" for 1973–74, Exhibit "E" for 1974–75, and Exhibit "F" for 1975–76.

## II.

### FACULTY, STAFF AND PERSONNEL:

#### A. INITIAL TRANSITION

It is recognized that the implementation of Part I of this plan will require certain drastic changes in faculty, staff and administration as a result of the suspension of some schools, the geographical reassignment of student body by grades, and the realignment of courses to accomplish the change in pupil assignment. The School District will develop and utilize objective non-racial criteria in effectuating the transfer and reassignment of faculty and staff to implement the plan. To the greatest extent possible, the District will maintain in each school a ratio of faculty and staff compatible with the racial composition of the faculty and staff of the School District as a whole. Of course, in certain areas where certain skills are essential and are not available in exact racial proportion required, adjustments must be made, with the School District constantly striving to maintain the appropriate ratio of each school. In addition, the Administration must be given some latitude in assignment of principals and teachers to those schools most drastically affected who are considered especially qualified to facilitate an orderly transition with a minimum of disruption of school routine.

#### B. FUTURE ASSIGNMENTS

The WISD will, in the immediate future, adopt a comprehensive program containing appropriate non-racial objective criteria to be utilized in screening personnel being considered for promotion, demotion, transfer and newly opened positions. Said program will contain suitable notice and provisions so that any qualified applicant or interested employee will have an opportunity to be considered objectively without regard to race, color, creed, sex, age or national origin. The District will endeavor to

acquire a faculty and staff reflecting the racial composition of the student body in the District as a whole and once acquired will endeavor to maintain that racial balance at each school in the District. The District will implement an affirmative employment policy whereby every eligible Mexican-American applicant will be hired. The District will continue systematic and intensive efforts to recruit minority group staff at the professional, para-professional, and non-professional level. The efforts shall include recruitment trips at least twice a year to various colleges and universities where Mexican-American graduates can be found. These include, but are not limited to, the University of Texas at Austin, the University of Texas at El Paso, the University of Houston, Baylor University, North Texas State University, Pan American University, Texas A & I University (Kingsville and Laredo campuses), St. Mary's University, Our Lady of the Lake College, and Sul Ross University. District personnel will work with Mexican-American community groups in planning these recruitment trips.

## C. ADMINISTRATIVE STAFF

Without sacrificing or lessening its standards of excellence in administrative personnel, the School District will continue to seek out and attempt to employ minority individuals who can demonstrate their qualifications, aptitude and enthusiasm for staff positions on the administrative level. One of the District's priorities is the recruitment of a Mexican-American administrator and at least a portion of his responsibilities will be related to the needs of Mexican-American students. The District recognizes that a Mexican-American administrator in the school system will be beneficial to the educational development of Mexican-American children.

### III.

## SITE SELECTION AND CONSTRUCTION

A. It is recognized that gerrymandering attendance zones, suspension of schools, pairing and clustering of schools and large scale transportation of students are inappropriate as permanent solutions to the desegregation challenge. The location and construction of schools in areas which afford an opportunity to serve students of all three races without undue burden can assist greatly in easing the burdens of desegregation.

B. The School District will undertake to develop objective non-racial criteria to govern in the selection of property to be acquired by the District and possible future construction so that neutral sites will be selected in order that one race will not be advantaged over the others.

### IV.

## EXISTING FACILITIES

The WISD has developed over a period of many years and operates in facilities ranging from two high schools less than two years old to some elementary schools approaching 70 years of age. Thus it is apparent that in terms of newness, modern structures and in some cases, comfort and convenience, all students cannot be housed in equal facilities. Nevertheless, the District recognizes and obligates itself to utilize the full extent of its maintenance department and maintenance budget to keep every school in the District in as good condition as financially practical. In addition, the District will appropriate or expend its maintenance budget strictly on the basis of need and urgency without regard to racial or ethnic composition of the students in attendance or the geographical location of the school. The District has established priorities for renovation and new construction to serve those areas in the District which are

now educated in significantly older facilities. The District's obligation to prevent new school construction in racially or ethnically identifiable neighborhoods will not be construed to prohibit the renovation or reconstruction of existing older buildings, such as South Junior High School, South Waco Elementary and older wing of Bells Hill Elementary.

## V.

## EXTRA CURRICULAR ACTIVITIES

The District has and will continue to make available the opportunity to participate in all extra-curricular activities to any student who is interested and qualified, regardless of race, color or ethnic background. To the extent that the re-alignment of students and the utilization of normal selective methods prevents a representative portion of minority students from participating in extra curricular activities at any school, the District will refine its plan whereby representative numbers of the minority students in that school will be enabled to participate provided they are qualified and have indicated their interest by previous efforts to participate. Such a plan will be developed by the administration and implemented through the office of the principal of each school with such assistance from the various student councils or student body organizations as might appear appropriate.

## VI.

## TRI-ETHNIC COMMITTEE

The Court may want some review of the implementation of the plan and its order by citizens representing all races to report to the Court either at regular intervals or as the Court may deem proper. To this end, the District will cooperate with such Committee as the Court may appoint, including the furnishing of data by the Administration which is pertinent and relevant to review the District's progress and the opportunity of said Committee to appear before the regularly constituted school Board at reasonable times and places to make its findings known when appropriate. The District will appoint in addition, a tri-ethnic committee with representation from all three ethnic groups to assist in the implementation of the minority to majority transfer plan and in the expenditure of Federal funds obtained through the Emergency School Aid Program (ESAP). The existing Tri-racial Advisory Committee will not be called upon to perform this function.

## VII.

## JURISDICTION AND LITIGATION

The Court will maintain continuing jurisdiction to enforce the plan approved and see that its mandates and guidelines are adhered to. The District will submit reports to the Court of the progress of the desegregation plan with such data and at such intervals as deemed appropriate by the Court.

## VIII.

## SPECIAL PROGRAMS

A. BI-LINGUAL AND BI-CULTURAL PROGRAMS

The School District will continue to improve and expand its program of bi-lingual and bi-cultural activities. Efforts will be made to acquire supplemental funding from the emergency school aid program and other areas to develop curricula, continue to seek consultative assistance and involve more participation. The bi-lingual program for the 1973–74 school year will be expanded at South Waco Elementary School to include a third year; first grade bi-lingual programs will be implemented at Gurley and Bells Hill Elementary Schools; the bi-lingual program presently in grade one at Sul Ross Elementary School will follow the children to their 1973–74 assignment and will be expanded to a second year. The bi-lingual program at the kindergarten level will be maintained. The retention of a somewhat disproportionate number of Mexican-American

students in the University sector will enable a concentration of programs in the area to combat any lowering of the self image concept by Mexican-American students and continued efforts will be made to recruit a greater number of bi-lingual and Mexican-American faculty and staff into the District. The District will interview prospective applicants in universities with a significant number of Mexican-American students and will continue to coordinate with Baylor University and Paul Quinn College to encourage graduates of these schools with bi-lingual abilities to consider WISD for employment. The use of Mexican-American aides in the bi-lingual program will be continued and efforts will be made to expand it. For the 1973–74 school year, the School District will implement a more sophisticated bi-lingual, bi-cultural program. In order to accomplish this, the District will utilize available Mexican-American educational consultants and will continually reevaluate the bi-lingual program. As a complement to the classroom instruction, the District will also formulate special educational assemblies and/or workshops.

The District will also conduct faculty and staff workshops to minimize the effects of any discriminatory practices and/or attitudes. The District recognizes that the bi-lingual educational program has encouraged more participation in the schools by the Mexican-American parents and will continue to explore innovative methods by which the school system can benefit from the parents' input.

## B. SPECIAL EDUCATION

The School District will continue to review its testing and assignment procedures to assure that such assignments eliminate possibility of classification on any sort of racial, cultural or ethnic basis. The Department will continue to follow Plan A of special education and those students in the EMR category will be assigned to the regular classroom on the basis of their residence in the attendance zones outlined in Part One of

this plan without regard to race or ethnic background. The School District will assure that any child whose primary home language is Spanish will be given an opportunity to be tested in Spanish. In addition, any Mexican-American child who had been classified as educable mentally retarded based upon tests depending primarily upon English capabilities and vocabulary, will be retested either on a nonverbal basis or in Spanish.

The School District will request the Region XII Testing and Service Center to reevaluate its test and testing procedures in light of any local bias against the Mexican-American or Black culture with a view toward making any changes such evaluation might show to be appropriate to avoid any such bias.

## IX.

## TRANSPORTATION AND TRANSFERS

All students who are assigned to schools more than two miles distant from their home will be provided transportation at no cost to them. In addition, a majority to minority transfer policy will be implemented whereby a student who is assigned to a school in which his racial group constitutes subtantially more of the student body than in the School District as a whole will be permitted to transfer to another school in the District where such is not the case with free transportation provided, limited only by efforts to prevent severe overcrowding of prospective transferee schools. A student whose racial group constitutes 15% more of the student body than in the District as a whole, will be eligible to transfer under this program.

Except as provided in this plan, no students will be permitted to transfer out of the school to which he is assigned. The administration in all cases of transfers into the District from students outside the District will assign such students to schools which will protect and promote the racial balance of the school in the District.

## EXHIBIT "A"

### PROJECTED ENROLLMENT OF UNIVERSITY HIGH SECTOR

| School | Grade | Enrollment | | | |
|--------|-------|-----|-------|-------|-------|
| | | M–A | Black | Anglo | TOTAL |
| University Senior High | 10–12 | 329 | 132 | 686 | 1147 |
| University Junior High | 8–9 | 292 | 201 | 514 | 1007 |
| South Junior High | 7 | 160 | 95 | 252 | 507 |
| Sul Ross Elementary | 6 | 152 | 98 | 244 | 494 |
| Alta Vista Elementary | 1–5 | 24 | 67 | 310 | 401 |
| South Waco Elementary | 1–5 | 217 | 136 | 53 | 406 |
| Gurley Elementary | 1–5 | 115 | 39 | 98 | 252 |
| Kendrick Elementary | 1–5 | 72 | 100 | 334 | 506 |
| Bell's Hill Elementary | 1–5 | 248 | 28 | 165 | 441 |
| Meadowbrook Elementary | 1–5 | 84 | 84 | 250 | 418 |

## EXHIBIT "B"

### PROJECTED ENROLLMENT OF WACO HIGH SECTOR

| School | Grade | Enrollment | | | |
|--------|-------|-----|-------|-------|-------|
| | | M–A | Black | Anglo | TOTAL |
| Waco High | 10–12 | 106 | 127 | 638 | 871 |
| North Junior High | 7–9 | 63 | 197 | 622 | 882 |
| Brook Avenue Elementary | 6 | 24 | 98 | 209 | 331 |
| Cedar Ridge Elementary | 1–5 | 17 | 169 | 228 | 414 |
| Lake Waco Elementary | 1–5 | 24 | 153 | 287 | 464 |
| North Waco Elementary | 1–5 | 56 | 146 | 238 | 440 |

## EXHIBIT "C"

### PROJECTED ENROLLMENT OF JEFFERSON-MOORE SECTOR

| School | Grade | Enrollment | | | |
|--------|-------|-----|-------|-------|-------|
| | | M–A | Black | Anglo | TOTAL |
| Jefferson-Moore High | 11–12 | 45 | 480 | 27 | 552 * |
| Tennyson Junior High | 7–9 | 83 | 271 | 571 | 925 |
| R. L. Smith | 6 | 27 | 88 | 193 | 308 |
| Parkdale Elementary | 1–5 | 13 | 195 | 315 | 523 |
| Crestview Elementary | 1–5 | 64 | 230 | 321 | 615 |
| Provident Hts. Elementary | 1–5 | 63 | 98 | 229 | 390 |

Note:

* The Richfield students attending required English and Civics courses will tend to equalize the apparent imbalance at this school by providing approximately 800 Anglo students in Jefferson-Moore each day.

## EXHIBIT "D"

### PROJECTED ENROLLMENT OF RICHFIELD SECTOR

| School | Grade | Enrollment | | | |
|---|---|---|---|---|---|
| | | M–A | Black | Anglo | TOTAL |
| Richfield High | 10–12 | 50 | 439 | 1316 | 1805 |
| Lake Air Junior High | 7–9 | 31 | 463 | 780 | 1274 |
| J. H. Hines Elementary | 6 | 9 | 158 | 237 | 404 |
| Mountainview Elementary | 1–5 | 2 | 238 | 343 | 583 |
| Dean-Highland Elementary | 1–5 | 26 | 214 | 286 | 526 |
| Viking Hills Elementary | 1–5 | 4 | 174 | 250 | 428 |
| Hillcrest Elementary | 1–5 | 6 | 173 | 244 | 423 |

### JEFFERSON-MOORE & RICHFIELD PROJECTIONS

#### EXHIBIT "E"

#### 1974–1975

| School | Grade | Enrollment | | | |
|---|---|---|---|---|---|
| | | M–A | Black | White | TOTAL |
| Jefferson-Moore High | 10–12 | 68 | 457 | 417 | 942 |
| Richfield High | 10–12 | 32 | 371 | 1149 | 1552 |

#### EXHIBIT "F"

#### 1975–1976

| School | Grade | Enrollment | | | |
|---|---|---|---|---|---|
| | | M–A | Black | White | TOTAL |
| Jefferson-Moore High | 10–12 | 82 | 260 | 611 | 953 |
| Richfield High | 10–12 | 53 | 432 | 1089 | 1574 |