Tallulah MORGAN et al.,
Plaintiffs-Appellees,

v.

John J. KERRIGAN et al.,
Defendants-Appellees,

and

John P. Doherty et al.,
Intervenors-Appellants.

No. 75–1097.

United States Court of Appeals,
First Circuit.

Argued Sept. 12, 1975.

Decided Jan. 26, 1976.

John F. McMahon, Boston, Mass., with whom Angoff, Goldman, Manning, Pyle, & Wanger, Boston, Mass., was on brief for appellants.

John Leubsdorf, Boston, Mass., with whom Laurence S. Fordham, Foley, Hoag & Eliot, J. Harold Flannery, Washington, D. C., Robert Pressman, Eric E. Van Loon, Cambridge, Mass., Rudolph F. Pierce, Keating, Perretta & Pierce, Boston, Mass., Roger I. Abrams, Cleveland, Ohio, Thomas M. Simmons, Boston, Mass., and Nathaniel R. Jones, New York City, were on brief, for plaintiffs, appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This is an appeal arising out of the Boston school desegregation litigation, in which intervenors, representing the Boston Teachers Union, challenge a district court order fixing goals governing teacher recruitment and hiring in the Boston public schools. *Morgan v. Kerrigan*, 388 F.Supp. 581 (D.Mass.1975). Plaintiffs-appellees are the class of black parents and school children which initiated the suit,[1] resulting in a finding of intentional segregatory policies affecting, among other parts of the school system, the recruitment and hiring of black teachers. *Morgan v. Hennigan*, 379 F.Supp. 410, 456–66 (D.Mass.1974), *aff'd sub nom. Morgan v. Kerrigan*, 509 F.2d 580, 595–98 (1st Cir. 1974), *cert. denied*, 421 U.S. 963 (1975). A previous teacher hiring order containing a one-for-one hiring provision similar to that in the instant case, but effective only for the 1974–75 school year, was affirmed in *Morgan v. Kerrigan*, 509 F.2d 599 (1st Cir. 1975).

The district court ordered Boston school officials to hire one black teacher for each white teacher hired until 20 percent of the faculty was black. The union objects to this 20 percent figure,[2] which was selected by the district court as representing approximately the percentage of blacks in the total Boston population. The union argues that the goal should instead be cast in terms of the labor pool of present college students and recent graduates in the Boston area.

This argument fundamentally misapprehends the nature of this case. The plaintiffs are not the black teachers or would-be teachers who have been discriminated against because of their race. The district court's examination of the School Committee's recruitment, hiring, transfer and promotion policies was undertaken to determine whether those policies violated the rights of black Boston public school children. It is the rights of those children that the order in issue is intended to protect. *See Morgan v. Kerrigan*, 509 F.2d 599, 600 (1st Cir. 1975). In its effort to eliminate segregation and its effects "root and branch", *Green v. County School Board*, 391 U.S. 430, 438 (1968), the court's equitable power to fashion a remedy is both broad and flexible. *Swann v. Charlotte-Meck-*

---

1. The other parties to the litigation, including the School Committee, the Mayor and other city officials, and the state Board of Education, are not parties to this appeal.

2. The union also suggests that the one-for-one hiring ratio is an unlawful racial preference, citing *DeFunis v. Odegaard*, 416 U.S. 312 (1974) (Douglas, J., dissenting). This argu-

ment, however valid it may be as a general proposition, has no application where substantial constitutional violations have been found. The cases cited in the textual discussion, *infra*, are only a few of many attesting to the propriety of remedial hiring orders along the general lines of that promulgated below.

*lenburg Board of Education,* 402 U.S. 1, 15 (1971).

With this objective in mind, some courts have set as a teacher hiring goal the percentage of minority students in a given school system, which for Boston in 1973–74 was 35 percent. *See, e. g., Keyes v. School District No. 1,* 521 F.2d 465, 484 (10th Cir. 1975); *United States v. Texas Education Agency,* 467 F.2d 848, 868, 873 (5th Cir. 1972); *Arvizu v. Waco Independent School District,* 373 F.Supp. 1264, 1270–71 (W.D.Tex.1973), *rev'd in other respects,* 495 F.2d 499 (5th Cir. 1974). The court's refusal to do so here was apparently motivated at least in part by a desire to minimize court involvement over a period of time.

The 20 percent goal fixed by the district court finds support in hiring discrimination cases not involving students' rights, where courts have often resorted to gross population ratios for remedial purposes. *See, e. g., Boston Chapter, NAACP v. Beecher,* 504 F.2d 1017, 1026–27 (1st Cir. 1974), *cert. denied,* 421 U.S. 910 (1975); *NAACP v. Allen,* 493 F.2d 614, 617 & n. 3, 621 (5th Cir. 1974); *Carter v. Gallagher,* 452 F.2d 315, 328 & n. 2, 330–31 (8th Cir. en banc), *cert. denied,* 406 U.S. 950 (1972). Population ratios of course are not necessarily appropriate in hiring cases; a proper goal may be smaller or larger than the local population percentage. *See United States v. Ironworkers Local 86,* 443 F.2d 544, 553 (9th Cir. 1971), *aff'g* 315 F.Supp. 1202, 1234, 1247 (W.D.Wash.1970). As the union points out, positions for employment may be so specialized that general population statistics are of little value in setting goals, citing *Mayor of City of Philadelphia v. Educational Equality League,* 415 U.S. 605 (1974), *Hester v. Southern Railway Co.,* 497 F.2d 1374 (5th Cir. 1974), and our own opinion in *Castro v. Beecher,* 459 F.2d 725, 737 (1972). This was apparently the situation in *Rios v. Enterprise Ass'n, Steamfitters Local 638,* 501 F.2d 622 (2d Cir. 1974). If these cases stand for the general proposition, as the union argues, that area population is an inadequate measure of the labor pool in certain hiring discrimination cases, it would still remain for the union

to demonstrate that the percentage of blacks in the appropriate pool here is lower than their percentage of the general Boston population. This has not been done.

Before the district court, the School Committee's position was that the appropriate goal should be the percentage of black college graduates of all ages, in Boston or in the northeast section of the country, 5.25 and 4.24 percent respectively. Such a goal would have entirely nullified the court's previous finding of constitutional violations in the recruitment and hiring of faculty, as the percentage of black teachers in the Boston system had already exceeded 7 percent in 1972–73 and the Committee's proposed goals would have permitted backtracking rather than constituting remedial relief. The union objected to the Committee's proposal, however, on the grounds that the pool it was based on was too broad, and proposed instead a pool of all college graduates carrying a Massachusetts certification. The statistic on this pool does not appear to have been presented, but there is no reason to believe that it deviates much from the clearly insufficient 4–5 percent range.

■ Since no other figures less than 20 percent were presented to the district court, there is no support in the record for the suggestion, only now advanced by the union, that the ratio of blacks in the appropriate pool (now defined as present college students and recent college graduates in the Boston area) is approximately 12 percent. Even assuming that the union's definition is correct, a question we need not decide, the union simply has not presented a convincing case that blacks in fact constitute 12 percent of the pool as so defined. The union reaches its suggested figure by extrapolating from the rise in the percentage of blacks attending college throughout the nation from 1964 to 1972. This figure, however, is also approximately the same as the percentage of blacks in the national population (11 percent). Since there is a higher percentage of blacks in the Boston area, it is likely that there is also a higher percentage of

black college students and recent graduates. The union advances no indication that a lower proportion of college students and recent graduates exists in the Boston area black population than nationally. In short, the union has done nothing to rebut the natural inference that the ratio of blacks in the appropriate pool (as the union now defines it) roughly reflects the 20 percent figure chosen by the district court.

■ We note also that there is no reason to believe that the 20 percent figure was unrealistic. The availability of a substantial number of qualified black applicants (and the district court did not demand the hiring of anyone who was unqualified) was demonstrated by the fact that in the month following the court's first recruitment order on July 31, 1974, the percentage of black faculty was increased from 7.1 to 10.4 percent. This indicates that pessimism as to the prospects of finding qualified black teachers should not be overestimated. As the union points out, there may well be an oversupply of applicants for teaching positions in Boston. While affirmative action to rectify past discrimination is more painful during a time of underemployment than in one of full employment, that fact is no excuse for inadequate action. The goal set by the court has no deadline date. As the court recognized, it contemplates "a gradual increase in the number of black teachers over several years". The prospect of placing 500 additional black teachers in a teaching force of over 5,000 over several years does not seem to us to place an undue burden on the non-minority labor force.

We therefore hold that the district court did not abuse its discretion in selecting a 20 percent hiring goal. Should experience demonstrate over time that even the most diligent efforts fail to make demonstrable progress toward that goal, there will be adequate opportunity to request appropriate relief. Conversely, time may indicate the goal to be too modest. At the moment it must stand

as a reasonable judgment on this record. What we have said concerning the hiring goal applies a fortiori to the union's objection to that part of the court's order which requires aggressive recruitment until a 25 percent black teaching staff is obtained. This figure was lower than the 35 percent recommended by plaintiffs; no other termination point was suggested; and it provides a built-in terminus for court responsibility.

■ The union also challenges, as imposing an absolute preference, one aspect of the one-for-one hiring method: a "catch-up" provision regarding provisional teachers.[3] Most of the teachers in the system are permanent teachers—a tenured position for which state certification is required. However, Massachusetts law allows (upon a showing of hardship which has been routinely applied for by Boston) the hiring of provisional teachers, who are considered to have tenure after they have been employed three consecutive years. Most of these teachers also have certification, although the primary paper qualification is simply a college degree. The district court order provides for the hiring of permanent teachers on a one-for-one basis, and for a rehiring of provisionals (should Boston choose to rehire them) also on a one-for-one basis. However, due in part to the discriminatory policies found to have been practiced by the School Committee in the past, the number of white provisionals considerably exceeds the number of black provisionals presently in the system. The district court departed from the strict one-for-one requirement to allow all of the unpaired white provisionals to be rehired (should the Committee so choose) before turning to the hiring of new provisionals. Then, in order to restore the balance, the court provided that any new provisionals hired be black, until the number of new black provisionals hired equalled the number of unpaired white provisionals rehired. It is this "catch-up" which the union attacks. Taken in the context of the court's relaxation of the one-for-one

3. This provision was not explicit in the order reported at 388 F.Supp. 581, but was agreed by the parties to be intended by the phrasing of the order.

contemporaneous hiring order to allow wide latitude to upset the balance in favor of the extra white provisionals, it is clear that this catch-up provision is far from an absolute preference. The Committee is even free to rehire extra white provisionals and hire no new provisionals. Indeed, it has indicated that this is the course it plans to take, filling new vacancies primarily with permanent teachers. The court's order protects any expectations of rehiring the provisionals may have, without jettisoning the one-for-one ratio, and, at most, would result in half the provisionals being black. This sensitive tailoring of the hiring formula is well within the discretion of the court.

Finally, the union objects to the failure of the court to require that black applicants for permanent teaching positions in kindergarten, primary and elementary grades have taken certain reading and methods courses. Although the School Committee has required these courses of new applicants for several years, it cannot be said that failure to have taken them renders the applicant unqualified. To be considered as a permanent teacher, one must possess a Massachusetts certification, for which these courses are not required. The court order further provided for the disqualification of applicants who had previously been found unsatisfactory in a Boston teaching position, or who were rejected after an interview if reasons were specified. There were also specialized requirements for certain fields.

The School Committee may have felt the reading and methods courses were desirable, but it has not appealed from the court's order in this respect. Moreover, teachers hired before 1970 were not subject to this requirement and have not been subsequently obligated to fulfill it. On the other hand, all but two or three black applicants approved in the summer of 1974 for the relevant grades had in fact completed the courses. Indeed, counsel for the union stated that most majors in education would have taken the courses. His argument was that the impact of the additional course requirements, though minimal, was neutral.

The issue becomes minute. The court did not abuse its discretion. The interests of the school system were not sacrificed, and a potential basis for rejecting an otherwise qualified black teaching applicant was removed.

*Affirmed.*