Patricia Ann HORTON, Brenda Jeanette Horton, Sherry Yvonne Horton, Jacquelyn Horton, and Walter Renay Horton, by their father and next friend, Walter Horton, Plaintiffs,

v.

The LAWRENCE COUNTY BOARD OF EDUCATION, L. P. Hopkins as Chairman of the Lawrence County Board of Education, Silas B. Cross, as Supt. of the Lawrence Cty. Bd. of Educ., John M. Roberts, Robert W. Terry, Ernest Guest, and Paul Montgomery as members of the Lawrence Cty. Bd. of Education, and their successors in office, Defendants.

Civ. A. No. 66–445.

United States District Court, N. D. Alabama, Northeastern Division.

Dec. 30, 1970.

Solomon S. Seay, Jr., of Gray, Seay & Langford, Montgomery, Ala., Oscar W. Adams, Jr., Birmingham, Ala., Norman C. Amaker, and Jack Greenberg, New York City, for plaintiffs.

Gene Lentz, of Brewer & Lentz, Decatur, Ala., for defendants.

## MEMORANDUM OF DECISION AND ORDER

POINTER, District Judge.

It is appropriate at the outset to summarize those matters of record in this case which form the background for this hearing.

*June order.* On June 12, 1970, Judge C. W. Allgood of this court entered an order respecting the Lawrence County school system under the Fifth Circuit's mandate contained in Singleton v. Jackson Municipal Separate School Dist., 419 F.2d 1211 (1970). With only slight variations from the *Singleton* language, the order contained provisions indicated therein for "desegregation of faculty and other staff," "majority to minority transfer policy," "transportation," "school construction and site selection," and "attendance outside system of residence." In directing the conversion from a dual system, the order established six attendance zones for students, closed two schools (Moulton High and Midway Elementary), changed the grade structures at several schools, and required non-discriminatory class assignments at the county Vocational and Technical School.

*Board proposal.* On July 15th, the County Board filed objections to the student desegregation portion of the June order, the principal complaint being the "termination of the Freedom of Choice Plan under which the public schools of Lawrence County, Alabama, have operated." Coupled with its objections, the Board requested modifications in the following order of preference: (1) authorization of student freedom-of-choice to attend any school within the county on a space-available basis; (2) re-opening Moulton High and Midway Elementary, re-structuring grades at a number of schools, thereby creating in a couple of the attendance zones more than one school offering the same grades, with authorization then for students to select which school within their zone they wanted to attend; and (3) reopening Midway Elementary, and pairing of two or three schools in several of the attendance zones into a single "administrative unit" to give greater flexibility in providing adequate space. The proposal for administrative units was accompanied by the representation that none of the "buildings or facilities shall have a racial composition which indicates that either facility was intended for one race or the other," and it was stated that the "defendants recognize that the judicial mandates of the higher courts require

'unitary' systems, and it is felt that the foregoing alternatives will * * * create such."

*August order.* On August 13th Judge Allgood entered an order overruling the Board's objections, but amending the June order regarding student desegregation along the lines of the Board's third alternate: allowing specified combinations of schools into a single administrative unit, and also permitting re-opening of the Midway Elementary School. It provided, as regards these multiple-facility, single-administrative units that no facility should have a racial composition indicating it was intended for one race; and the order also directed that a report be furnished to the court by October 15th showing the racial composition of students and faculty at each school in the system.

*Plaintiffs' Motions.* On September 1st the plaintiffs filed a "Motion for Expedited Hearing," complaining that the faculty and staff assignment provisions of the June order had been ignored, and that reopening of the Midway School would frustrate desegregation within its attendance zone. On the following day they filed a "Motion to Cite for Contempt for Failure to Obey Judgment" against Silas Cross as Superintendent, asserting that, through establishing similar grades in two or more schools within the same "administrative unit" and then assigning students to classrooms on the basis of color, the Board had perpetuated a segregated dual school system.

*Board's Motion.* On September 9th the defendants filed a "Motion for Relief of Rigidity of Zoning Requirements," seeking authority to allow pupils to attend, on a space-available basis, a school located in another attendance zone if they had attended that school in the preceding year and provide their own transportation.

A hearing on the three motions was scheduled by Judge Allgood for October 1st, but had to be continued until November 16th. Due to Judge Allgood's being engaged in the trial of another case on that date, evidence on the motions (along with that in another case involving the same attorneys and the same defendants) was taken ore tenus before Judge Sam C. Pointer, Jr. The case was thereafter transferred from Judge Allgood to Judge Pointer for all further proceedings, including a decision on the pending motions.

Appearing on behalf of plaintiffs were Oscar W. Adams and U. W. Clemon, Attorneys, Birmingham. Appearing for defendants was Gene H. Lentz, Attorney, Decatur.

## I. STUDENT DESEGREGATION

It is clear that the "multi-campus single-administrative-unit" label has been employed as a device to continue a dual school system in parts of Lawrence County. The facts are without substantial dispute:

*Town Creek zone.* In the Town Creek attendance zone the June order provided for grades 1-4 to be at Hazelwood Elementary and grades 5-6 at Town Creek Elementary. Under the August order the two were combined into a single administrative unit, along with the high school serving the zone. Now grades 1-6 are being taught at each of the two schools. Approximately two-thirds of the Negro pupils of elementary age in the zone are attending Town Creek—there are no white students at Town Creek, for they are all attending Hazelwood.

*Courtland-Hillsboro zone.* Hillsboro Elementary and Tennessee Valley have this semester, under the label of a single administrative unit, been providing the first six grades to pupils of this zone, with the same six grades also being offered in this zone at Central High and Courtland High—four elementary schools in the same zone. Tennessee Valley and Central have no white students, while more than 90% of the student body in the elementary grades at the other two schools is white. Moreover the four high school grades are being taught at both Central and Courtland about a mile apart, with Central

having an all-black student body and Courtland being over 70% white.

According to Superintendent Cross, "We just delegated the responsibility [for desegregation] to the two principals in each community, and said, 'Now do as much as you can.' And there was no explicit amount that they were told to do." About the most that can be said is that there is but one football team and one band for Central-Courtland, and that for one period a day (physical education) black girls are bussed from Central to Courtland and white boys are bussed from Courtland to Central. On being asked whether the fiction of a single administrative unit constitutes a return to freedom-of-choice, Cross candidly stated, "I think it is fair to assume that it amounts to that. We are not calling it that."

Defendants have totally defaulted in the representations previously made by them to this Court, namely, that authorization of administrative units would not result in any facility becoming identified as a school for one race or another. The concept of multi-facility single-administrative units has been a subterfuge for perpetuating a dual school system in portions of Lawrence County which cannot be tolerated or condoned by this Court.

Accordingly, the authorization granted by the August order to combine schools into administrative units is due to be— and is hereby (effective with the commencement of the next semester of school, and in no event later than February 1, 1971)—revoked and rescinded. It is the order of this court—directed to the defendants, their agents, servants, employees and attorneys (and any others who may be in active concert or participation with them)—that by such date:

(1) Hazelwood Elementary and Town Creek Elementary schools shall provide grades which are mutually exclusive of one another. Whether the structuring shall be as was provided in the June order (Hazelwood, grades 1–4, and Town Creek, grades 5–6) or in some other combination is a matter for determination by the Board of Education.

(2) Hillsboro Elementary and Tennessee Valley schools shall provide grades which are mutually exclusive of one another. Whether the structuring shall be as was provided in the June order (Hillsboro, grades 1–2, and Tennessee Valley, grades 3–6) or in some other combination is a matter for determination by the Board of Education.

(3) Central and Courtland schools shall provide grades which are mutually exclusive of one another. Whether the structuring shall be as was provided in the June order (Central, grades 7–12, and Courtland, grades 1–6) or in some other combination is a matter for determination by the Board of Education.

(4) Where in any school in the Lawrence County system there is more than one section or class of the same grade, there shall be no discrimination on the basis of race or color in the selection of which pupils shall be assigned to a particular section or class. The Board shall require the preservation (for inspection by any interested person) of the method used at each school for assignment of students of the same grade to different sections or classes, and, depending upon the method utilized, of appropriate data showing the application of such method to the students in such grade.

(5) Where in any attendance zone there is more than one school offering the same grade, there shall be no discrimination on the basis of race or color in the selection of which pupils shall be assigned to a particular school. (Even with the changes indicated above, there will still be two zones where the same grade is offered in more than one school: in the Moulton zone, both Chalybeate Junior High and Midway Elementary will offer grades which duplicate those offered in the Moulton Elementary-Moulton Intermediate-Lawrence County High

sequence; and in the Courtland-Hillsboro zone, it is anticipated that the grades offered at the Hillsboro-Tennessee Valley sequence may be duplicates of those offered at Central or Courtland.) The Board shall preserve (for inspection by any interested person) data showing the method used, and its application to the students affected, in assigning students to different schools within the same attendance zone which have the same grade.

(6) No student shall be permitted to attend a school in the Lawrence County system outside the attendance zone of his residence. The proscription against cross-zone attendance applies whether or not the pupil is prepared to furnish his own transportation and regardless of the pupil-load at the two schools. (If enforcement of the zone lines results in overcrowding of one school, and under-attendance at another, the remedy is for the Board to alter the zone lines on application to this Court.) The only exceptions to the proscription are (a) the "Majority to minority transfer policy," as specified in the June order, and (b) accepting students from other school systems under the "Attendance outside system of residence," as specified also in the June order, and which is on the condition that such transfers not reduce desegregation in either system.

The directives outlined above are for the most part the same as ones imposed by the June order.[1] They are detailed to emphasize to defendants that they are required to take affirmative action to assure that these requirements are carried out—and that merely tossing the matter to school principals will not hereafter relieve them of their obligations. If there are difficulties in making changes in January, in the middle of a school year, it perhaps demonstrates

that the Board will have done no one a favor by the ruse of creating "administrative units."

The particular relief sought by plaintiffs—to cite the Superintendent for contempt—is for the present denied, but it is subject to renewal against him and the other defendants after the new semester commences if the circumstances warrant.

■ Plaintiffs' request for closing the Midway Elementary School is denied. While it is "all white" (some 160 white students, 0 black students), this appears to be the result of *de facto* residential segregation within the county— as is indicated by the student bodies at the other schools in the same zone which also provide classes in the six elementary grades (Chalybeate Junior High: 306 white, 0 black; Moulton schools: 1,055 whites, 147 blacks). Were Midway to be closed, its students would either go to another all-white school or swell the white ratio at the final school from 88% to 89%—so that, at most, the existence of Midway is reducing the number of white students who are having a racially-mixed learning experience. It should be noted that the August order, allowing re-opening of Midway, made the same subject to revocation upon proof that its operation mitigates against desegregation *elsewhere* within the zone. It may further be noted that, under directive number (5) above, assignments to the Midway school are to be made on a geographical or other non-discriminatory basis.

Defendants' motion for increased authority to allow crossing of zone lines (they already have that authority respecting majority-to-minority transfers) is hereby denied. Their representation that such would not retard conversion to a unitary system is, particularly in view of past performance, not credible.

1. This order, *supra* and *infra*, makes a few changes in the June order. Except as so modified, the June order remains in full force and effect. The August order is, except for the provision allowing re-opening of Midway School, being superseded by the present order.

## II. FACULTY DEMOTION AND HIRING PRACTICES

Plaintiffs charge that the Lawrence County system has ignored the provisions of the June order regarding hiring practices by (1) using a quota system to block employment of new black teachers and (2) by refusing to rehire Mrs. Pearl Allen on account of racial prejudice.

■ Superintendent Cross admitted using a quota system in hiring teachers this past Fall. He stated that the system was obliged under the June order to provide approximately 25% black teachers at each school, and that in line with this requirement he could hire only some 5–10 blacks of the 50-plus teachers newly hired for the past semester.

Plaintiffs' complaint as to the use of a quota is well taken. But not because such a practice is contrary to the June order. Indeed, as the Board has been so quick to take advantage of, the June order required that the percentage of black teachers at each school approximate the percentage of black *students* in the system. By insisting upon a correlation of teachers at each school to students in the system, the order effectively established a quota system for teachers based on race—which in turn means hiring of teachers *on account of* color rather than *without regard to* color. Use of such a standard apparently worked to the disadvantage of black applicants this past year; it could as well be to the disadvantage of white applicants next year. In any event such a requirement, which is not that contained in the *Singleton* decision and which is inconsistent with other provisions of the June order, is due to be modified. Accordingly, the requirement in question (which is the second sentence of item (2)A of the June order) is hereby amended so that it shall hereafter read as follows:

"The School Board shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire system."

This modification is intended to assure that hereafter hiring and promotional practices of the Lawrence County Board shall (excepting only preferential rights granted incident to certain demotions and dismissals, to be dealt with *infra*) be followed in a "color blind" fashion—without discrimination for or against anyone on account of race, color or national origin.

■ As to the specific charge that Mrs. Pearl Allen was discriminated against on account of her race in not being re-hired, the Court finds this to be without substance in fact. Mrs. Allen resigned from her position at Central High in January 1970 to have a baby, the same being born the very next month. She has not been re-hired because the principal at her school, also a Negro, gave a negative recommendation to the Superintendent. It very well may be that her difficulties or inadequacies were not such as could have been substantiated in a Board hearing had she, a tenured teacher, been fired; but it does not require the same degree of proof to justify the refusal to re-hire a person who has, without dispute, voluntarily resigned. After hearing both Mrs. Allen and the Superintendent, the Court is convinced that this is not a case of racial discrimination, but one which relates to her competency as a teacher and fellow worker.

Another complaint by plaintiffs is that the Board has not selected staff members to be demoted on the basis of "objective and reasonable non-discriminatory standards," as was required in the June order. Evidence was adduced on three specific cases:

*Loss of coaching supplement.* Walter Byrnes, a Negro, was head coach for a number of years at Moulton High, a school which was closed under the June order. Byrnes had taught history, civics and physical education at Moulton, and the $1,000 received

for coaching was in addition to the compensation received as a teacher. This year he is teaching reading at Midway (he had an English minor in college, and feels qualified for this course). He does not have any teaching duties. According to Byrnes, "I'm very happy where I am, sure. I'm satisfied with everything except the salary. I would like to have that thousand dollars."

*Reduction in compensation.* Under the June order the Tennessee Valley School was converted from a high school to an elementary school. The impact on Ollie Luster, a Negro who has been principal there for the past two years, is that he is receiving (as principal of an elementary school) some $73 less per month than he would be receiving if it were a high school. Luster, however, was offered a special position teaching at the county's vocational school at night—a position which he accepted, and which provides him approximately $160 per month in extra compensation.

*Elimination of principal's job.* The principal at Moulton High for some 10 years was C. C. Chunn, the holder of a master's degree and an AA certificate (principal-superintendent). Following the closing of Moulton High under the June order, the Board finally assigned Chunn, a Negro, as Assistant Principal at the "Courtland campus" of the Central-Courtland administrative unit. The Board appointed R. A. Hubbard, a Negro, as principal of the "Central campus", the same position he had held in the previous year, and the Board hired from another system about June 1970 Don Marsh, a white man, to be principal at Courtland (then scheduled to be an elementary school), a traditionally white school. As assistant to Marsh (who also has a master's degree, but only an A certificate from the state), Chunn teaches four classes a day, has two study halls a day, and has minor administrative duties—for which he is making some $100 less a month this year than last year notwithstanding a system-wide increase of some 8%.

The Board's response has essentially been to demur—admitting that it has not employed "objective and reasonable non-discriminatory standards", but asserting that, inasmuch as these situations arose due to the court-ordered conversion to a unitary system, there has been no demotion necessitating use of such standards. What the Board has done is to retain (or offer to retain) principals in the same school as the previous year, and neither consider such positions as subject to being filled on the basis of the non-discriminatory standards, nor consider such individuals as having to vie for a job on the basis of a non-discriminatory standards.[2]

This approach clearly contravenes the language and spirit of the June order and the *Singleton* requirements. The requirement for use of the non-discriminatory criteria arises if there is reduction in number of principals, teachers, etc., which results in a dismissal or demotion (which in turn is defined to include any reassignment involving less pay, or less responsibility, or lesser degree of skill, classroom duties for which not qualified) of any such employee. There is no exemption from the requirement because the reduction is occasioned

2. Another attempt at justification might have been to assert as controlling first standard, "seniority in position at the same school, regardless of compensation level." However, while such a standard would certainly be objective and, in the abstract, reasonable, its obvious effect would be discriminatory. Inasmuch as schools have been operated as "white" schools or "Negro" schools, use of standards which have the effect of freezing teachers at positions where they have previously taught will have the effect of perpetuating a dual system of teacher assignment. It is also reasonable to assume that (as in Lawrence County) schools selected for closing on conversion to a unitary school system will tend to be traditionally black schools.

by the court-ordered conversion to a unitary system—indeed, these provisions were inserted no doubt for the very reason that this conversion was seen as resulting in an ultimate economy, the concomitant burdens of which should be spread fairly among all the employees of the system.

■ Here is what should have been done, for example, respecting the principals: Under the June order the number of high schools in the system, and hence the number of high school principal jobs in the system, was reduced from nine to six. (Closing of Moulton High, and conversion to elementary status of Tennessee Valley and Courtland.) Of those who were principals at the close of the term,[3] seven were interested in re-employment for the 1970–71 year. (The principal at Courtland and Hatton left the county system.) All seven should have been considered by the Board for the six high school principalships on the basis of "objective and reasonable nondiscriminatory standards. The criteria should have been available for public inspection, and the evaluation of the seven persons under the criteria should have been made available to the one "demoted", or not selected for retention as a high school principal. Moreover, the one demoted (to an elementary school principalship) would have under the *Singleton* decree and the June order a "preferential right" to promotion— namely, that (if he is white) the Board must offer him a position as high school principal before it can hire or promote a black person as high school principal; and *vice versa*. That is, the person "demoted" must be given a right of first refusal before a person of a different race can be hired at the level from which demoted.

What has happened, however, is that no such evaluation has been made by the Board, two of the seven (both black)

have wound up with jobs of lesser responsibility and status, one new person (white) has been hired as a high school principal (at Hutton), and another new employee (white) is being compensated as a high school principal (at the "Courtland campus") in addition to "the" principal at the school (namely, the black principal at the "Central campus").

Given this situation—a failure to follow the procedure stated in the June order—the court is still confronted with the problem of the appropriate remedy or relief. This court is very reluctant to enter the arena of determining relative merit of teachers or principals—and particularly so when such determination could adversely affect persons not represented in this proceeding.

The "preferential rights" created in the *Singleton* decision provide an appropriate model for relief here: when the next vacancies in high school principalships in the Lawrence County school system arise (whether by resignation, death, or discharge of the existing principals, or otherwise), the defendants are hereby ordered to offer such positions to C. C. Chunn and Ollie Luster (giving first preference to the one of them that the Board shall determine, using objective and reasonable non-discriminatory standards); and the defendants are further ordered to pay C. C. Chunn (retroactive to the commencement of the 1970–71 school year) at the rate of compensation to which he would be entitled were he serving as high school principal, and to pay Ollie Luster at the rate of compensation to which he would be entitled were he serving as high school principal. In each case, their rights (to promotion and supplemental pay) shall continue only for such length of time as they remain employed by the Lawrence County system. Should either of them decline the promotion to high school

---

3. Although the formal order was not entered until June, the requirements of *Sin-* *gleton* had been known for several months.

principal when offered, he shall thereafter have no further rights to preferential promotion or to supplemental pay. The supplemental pay to Ollie Luster shall not be paid for any periods for which he receives compensation as an instructor at the vocational school. In awarding compensation at a level above the job being performed, the Court is in a sense following a pattern adopted by the Board itself—namely, in that it has been paying two principals and two head coaches at Central-Courtland while calling them one school, in an effort to satisfy desegregation requirements.

With regard to the situation of Walter Byrnes, the former coach, a slightly different factual case is presented. The matter of coaches' supplements is one within the ambit of the Dismissal/Demotion requirements, and should have been determined by looking at all coaches on the basis of objective standards. However, the evidence demonstrated that Byrnes effectively waived any such rights—that, while being considered for a coaching position, he learned that there was substantial opposition to him as a coach (and that this opposition stemmed from prior difficulties he had experienced as a coach of Negro teams) and indicated that he didn't want to go where he was not wanted—that he had rather not coach. Acting upon such response, the Superintendent dropped Byrnes from further consideration. Under the circumstances, it would not be appropriate to either pay Byrnes for work not performed or grant him a type of "first refusal." On the other hand, he can, if he wishes, indicate his interest in further coaching assignments and then be entitled to consideration, without regard to race, for such a position. Byrnes was quite candid at the hearing, noting that he didn't really know if he wanted to coach, that what he really wanted was "to be wanted." The desire to avoid the risk of non-acceptance is understandable, but not, at this point anyway, one which can be fulfilled by a court.