FORT BEND INDEPENDENT SCHOOL DISTRICT et al., Plaintiffs,

v.

CITY OF STAFFORD et al., Defendants.

Civ. A. No. H–77–1752.

United States District Court,
S. D. Texas,
Houston Division.

April 14, 1978.

Michael K. Swan, Reynolds, Allen & Cook, L. Chris Butler, Houston, Tex., for plaintiffs.

William A. Olson, Olson & Olson, Houston, Tex., Charles L. Michulka, City Atty., City of Stafford, Stafford, Tex., for defendants.

## MEMORANDUM OPINION

SINGLETON, District Judge.

The Fort Bend Independent School District (FBISD), the president of the Board of Trustees of FBISD, and other residents and parents of students in FBISD, have brought this action pursuant to 42 U.S.C. § 1983 and the fourteenth amendment seeking to permanently enjoin the City of Stafford from operating a municipal school district within the present boundaries of FBISD.

On December 16, 1976, one hundred and thirty Stafford citizens submitted a written petition to the mayor and city council pursuant to Tex.Education Code Ann. § 19.161 (1972) calling for an election on the proposition of whether Stafford should operate its own school system. An election was held on January 15, 1977, at which the proposition carried by a vote of 464 to 174.

Prior to the election, the Mayor of Stafford informed the Commissioner of Education of the State of Texas of the pending election and, immediately following the election, informed the commissioner of the results. Following an investigation of the effects of the new system on the desegregation status of the involved districts, the commissioner, issued a report on February 8, 1977, in accordance with the orders entered in Civil Action No. 5281, *United States v. State of Texas,* 447 F.2d 441 (5th Cir. 1971), finding that the new district would not violate the requirements of Civil Action No. 5281. These findings were reaffirmed in two subsequent reports dated May 16, 1977, and September 2, 1977. On October 6, 1977, FBISD attempted to file an appeal from the commissioner's decision with the State Board of Education which concluded by advisory opinion on November 12, 1977 that the board had no jurisdiction to entertain such an appeal.

Pursuant to Tex.Education Code Ann. § 19.161 (1972), the City Council of Stafford on June 6, 1977, enacted an ordinance formally creating the Stafford Municipal School District (SMSD). Another ordinance passed by the council on June 27, 1977, appointed a Board of Trustees for SMSD. July 15, 1977, sixty Stafford citizens submitted a petition to the mayor and city council for an election on a school maintenance tax proposition and school bond proposition, pursuant to Tex.Education Code Ann. § 24.06 (1972). Both proposals carried at an election held August 13, 1977, by a vote of 436 to 221 and 437 to 218, respectively.

On October 12, 1977, the Board of Trustees of SMSD approved and adopted a budget for the district for the year beginning September 1, 1977, and ending August 31, 1978. On the same date the board also directed the city council to levy, assess, and collect school ad valorem taxes for the year 1977 and all subsequent years.

On October 18, 1977, this court entered an order temporarily restraining the City of Stafford from taking any steps to collect taxes for school purposes until a final determination was made following a full hearing on the merits. The city council, on October

19, 1977, enacted an ordinance levying the school ad valorem tax. Following a full hearing before this court on January 23–26, 1978, an agreed order was entered whereby all 1977 ad valorem taxes on property situated in both districts would be paid to FBISD and in the event the court's decision is favorable to SMSD that district would look to FBISD for reimbursement.

Included in FBISD's complaint is their appeal to this court from the decision of the Commissioner of Education under the modified order in *United States v. Texas, supra,* Civil Action No. 5281. The validity of the new district is not challenged with regard to the procedures followed by the City of Stafford under state law. Rather FBISD alleges that the new district will have a negative effect on the continued implementation of its desegregation plan. A proposed school district found to have such an effect will not be permitted to operate regardless of whether such district was validly created under state law. *See, United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); *North Carolina Board of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971).

Having heard the testimony and having carefully examined the evidence and law applicable to the facts of this case, the court finds that the City of Stafford should be permanently enjoined from operating a school district coterminous with the city's boundaries.

## I. *FBISD—Background*

Fort Bend Independent School District is located southwest of the City of Houston in the northeast portion of Fort Bend County. There are three incorporated cities located within the Fort Bend Independent School District: Sugar Land, Stafford, and Missouri City. The City of Stafford is located in the north central portion of FBISD with its northernmost boundary coterminous with the Harris County line and the Houston Independent School District.

FBISD was formed in 1949 through the consolidation of the Sugar Land Independent School District and the Missouri City Independent School District. Prior to consolidation, both the Sugar Land Independent School District and the Missouri City Independent School District operated segregated school facilities. After 1959, FBISD operated dual school systems for black and white students and continued to do so until the last all black school was closed in the fall of 1968.

### A. *Desegregation Plan*

On or about June 23, 1964, the Board of Trustees for FBISD adopted a desegregation plan in an attempt to comply with the requirements of the Department of Health, Education and Welfare. The original desegregation plan adopted by FBISD provided for freedom of choice for high school students for the 1964–1965 school year. This desegregation plan was rejected by the Commissioner of Education for the Department of Health, Education and Welfare.

On or about May 10, 1965, the Board of Trustees for FBISD amended its desegregation plan. The amended plan was written in conformity with the statement of policy of Title VI of the Civil Rights Act of 1964 and approved by the Commissioner of Education for the Department of Health, Education and Welfare. The HEW Plan provided that commencing with the 1965–1966 school year, all high school level students (grades 9–12) would attend John Foster Dulles High School; commencing with the 1966–1967 school year, all junior high school level students (grades 6–8) would attend the John Foster Dulles Junior High School. The HEW Plan further provided that commencing with the 1966–1967 school year, all elementary level students (grades 1–5) would be zoned into neighborhood elementary schools. Each zone was based on population factors with an effort to provide an equal ethnic distribution.

Since 1965 FBISD has operated under the amended desegregation plan adopted on or about May 10, 1964, without substantial modification. FBISD has operated one senior high school facility, John Foster Dulles

High School. From 1965 until the 1974–1975 school year, FBISD operated one junior high school facility, John Foster Dulles Junior High School. During the 1977–1978 school year, FBISD was zoned for three junior high school facilities.

## II. *Site Selection-Racial Balance*

Commencing the 1978–1979 school year, FBISD will operate ten elementary school facilities. Pursuant to the 1965 amended desegregation plan, FBISD has redrawn its attendance zones for elementary schools each year that a new school has been added.

Possible future sites for schools are selected by the Assistant Superintendent for Business Affairs. Sites for future schools are selected five to six years prior to construction. The Assistant Superintendent consults with area builders and developers in an effort to determine the future racial mix of a subdivision. Site selection for all schools is determined ultimately by the Board of Trustees for FBISD. Sites for schools are selected in accordance with the Board policy of having neighborhood schools and having an ethnic balance in accordance with the district-wide balance.

FBISD has been and is making a good faith effort to avoid placing schools in the middle of one-race subdivisions. For example, the Quail Valley subdivision is predominantly Anglo in its racial composition. The Board of Trustees did not place an elementary school in the center of the Quail Valley subdivision in order to avoid creating a one-race school. Instead, the Board placed an elementary school on the periphery of Quail Valley so that surrounding areas with different ethnic distributions could be zoned into the school. Future plans for site selection in the Quail Valley subdivision include placing three more elementary schools on the periphery of that subdivision so as to continue the practice of zoning predominantly Anglo students with students of surrounding areas of different racial makeup.

On or about December 3, 1977, FBISD held an election to authorize the issuance of bonds in the amount of $35,000,000 to be used for the purpose of purchasing school sites and constructing school facilities. The voters of FBISD, including citizens located within the proposed Stafford Municipal School District, approved the bond issue, and the District is so authorized. The $35,000,000 bond issue of FBISD cannot presently be sold because of this pending litigation.

## III. *Enrichment Programs*

FBISD offers a high quality education through a full and complete curriculum including extra courses known as enrichment programs. Approximately 60 percent of the graduates from Dulles High School attend college. A variety of courses for students who are not college bound is also provided. A substantial portion of the enrichment programs, which include technical, occupational, and career courses, are aimed at students who do not plan to attend college.

A substantial portion of the minority students participate in these enrichment programs offered by FBISD. Course offerings in such programs are not those which are required by the State of Texas and hence they are paid for entirely from local funds without reimbursement from the state or federal governments.

As part of its enrichment programs, FBISD operates "activity buses" which transport students who remain after school to participate in extracurricular activities or to receive individualized instruction. "Activity buses" are also funded solely through local taxation without reimbursement from the state or federal governments. The black population of FBISD is largely concentrated in the far eastern portion of the district, some thirteen to fifteen miles from the Dulles High School campus. A substantial number of minority students utilize these buses.

FBISD provides a number of career counselors and nurses for its students. Each school campus has its own nurse. The cost of providing career counselors and nurses is funded solely through local funds without reimbursement by the state or federal

governments. The career counselors are utilized by and benefit a substantial number of minority students as do the school nurses for basic health care.

## IV. *City of Stafford*

The City of Stafford is located on the Fort Bend-Harris County line. Major traffic arteries into Stafford include Interstate 59 and U.S. Highway 90A (South Main). The City of Stafford covers approximately 5.9 square miles and contains approximately 4,100 people. It lies almost entirely within the limits of FBISD. A small portion of the city lies in Harris County and is part of the Houston Independent School District.

Part of three FBISD elementary school attendance zones are within the city limits of the City of Stafford. Parts of three junior high school attendance zones are located within the limits of the city. Dulles High School, the only high school facility operated by FBISD is bisected by the city limits of Stafford.

The movement for the creation of a municipal school district by the City of Stafford grew out of a protest over the elimination of busing by FBISD of those students who lived within two miles of the school they attended. The busing of students within the two-mile limit is not subsidized by state funds.

SMSD has hired no personnel and has offered no courses of instruction to date. SMSD owns no property or facilities for the education of students. Students living within SMSD have been and continue to be educated by FBISD.

The building plans for SMSD include a single campus which would contain school facilities for all grade levels. In addition, this campus would provide community athletic facilities and the seat of city government. Stafford, being primarily commercial and industrial, does not have an identifiable "Main Street" area around which a unified town has grown. This community-school facility would create such a "hub" for Stafford.

The thrust of this court's inquiry, however, is not toward what is good for the city of Stafford but, rather, what the impact of SMSD will have on the goal of equal education for all students, a goal which FBISD is in the continual process of achieving.

## V. *Impact of SMSD on FBISD*

The substantial residential growth experienced by FBISD in the recent past promises to continue. The enrollment in FBISD has grown from approximately 3,500 students in 1962 to approximately 14,621 students today. According to figures published in an FBISD bond brochure in November, 1977, FBISD estimates that its enrollment will increase to 28,086 by the school year 1982–83. The population of Fort Bend County has increased from 52,314 in 1970 to 103,010 at the end of 1977. This is a 96.90% increase since 1970.

While the county and the district have grown in population, the City of Stafford has had relatively little population growth and remains primarily an industrial and commercial area. Since its incorporation in 1959, Stafford's population has grown from approximately 500 to 4,100 at a rate of less than 200 persons per year. The approximate market value for that portion of the City of Stafford located within FBISD for January 1, 1977, was $182,273,333, which represents approximately 14.6 percent of the total market value for FBISD.

As of February 3, 1977, there were 1,057 students residing in Stafford enrolled in FBISD schools. This represented less than 8 percent of the total number of students in FBISD. As of October 7, 1977, there were 924 students residing in Stafford enrolled in FBISD schools. This represented less than 6.5 percent of the total number of students in FBISD.

The ethnic distribution of the 924 students residing in Stafford currently enrolled in FBISD schools is 571 (61.80%) Anglo, 326 (35.28%) Mexican-American, 24 (2.59%) black, and 3 (.32%) other.

Currently FBISD educates approximately 14,621 students of which 3,699 are on the high school level, 3,497 on the junior high

school level, and 7,425 are on the elementary school level. The racial composition of FBISD, including Stafford, is 9,926 (67.88%) Anglo, 2,731 (18.67%) Mexican-American, 1,733 (12.12%) black, and 191 (1.3%) other.

If SMSD were to become operational, it would be a school district with only 2.59% black enrollment where FBISD, including Stafford, is a school district with an overall 12.12% black enrollment. In SMSD there would be two or less black students in eight of its thirteen grade levels (K–12). There would be no more than four black students in any grade level in SMSD.

Three elementary schools, the only high school and one junior high school are located near the periphery of the boundaries of Stafford. Should SMSD become operational, the ability of FBISD to continue to zone minority students into each neighborhood school will be substantially restricted.

Implementation of SMSD would result in an increase in the percentage of Anglo students enrolled in Dulles Elementary School and in an increase in the percentage of minority students enrolled in the Jones Elementary School. Students living within SMSD have been and continue to be educated by FBISD. Approximately two-thirds of the commercial tax base of FBISD lies within Stafford and Sugar Land. On September 7, 1978, a request was presented to the City Council of Sugar Land to consider the possibility of Sugar Land's forming its own municipal school system as an alternative to being a part of FBISD. On September 21, 1976, that request was withdrawn upon the recommendation that Sugar Land await the outcome of Stafford's study of the matter.

The average cost of education per child in FBISD in 1976–1977 was $1,226. The projected cost per child in 1977–1978 is $1,300. The average market value per house in FBISD is $56,000. On the basis of educating one child per house, the application of an ad valorem tax rate of $1.40 per $100 of value, multiplied by 75 percent of the average market value ($39,000), results in $546 of residential tax revenue per child. FBISD bears 60 percent of the cost of

$1,300 to educate each child, or $780. Applying the $546 of residential tax revenue per child, FBISD must generate an additional $234 to educate each child. That additional amount is generated from commercial tax revenue.

Implementation of SMSD will have a substantial impact on those students residing in the remaining areas of FBISD who participate in the District's enrichment program. While FBISD stands to lose 14.6 percent of its total market value should SMSD become operational, the student population of the remaining FBISD will continue to increase. The loss of funds generated heretofore by this tax base will result in a substantial curtailment of the District's enrichment programs.

Implementation of the Stafford Municipal School District will interfere with an impede Fort Bend Independent School District's efforts to achieve and maintain a unitary school system.

The ultimate determination to be made in this case is whether or not the City of Stafford should be permitted to break away from the Fort Bend Independent School District and operate its own school district.

FBISD and the former Sugar Land and Missouri City Independent School Districts operated dual school systems for black and white students until 1968. Whether or not Stafford may now "erect new boundary lines for the purpose of school attendance in a district where no such lines had previously existed, and where a dual school system had long flourished. . . . must be judged according to whether . . . [the operation of SMSD] hinders or furthers the process of school desegregation." *Wright v. Council of the City of Emporia,* 407 U.S. 451 at 460, 92 S.Ct. 2196 at 2202, 33 L.Ed.2d 51 (1972).

■ Effect on FBISD, not motive on the part of Stafford is the paramount focus in this case. The Court in *Emporia* set out three factors to be considered in determining the permissibility of the school district's separation: (1) *changes in student composition* —not only mere changes in racial ratios

in the school districts, but whether shifts in ratios would likely precipitate further shifts in the racial composition of the districts, for example, white flight; (2) *changes in educational quality*—where creation of the new school district has a substantial adverse effect on the quality of education available for students remaining in the old district; (3) *timing*—whether the establishment of the new district comes at such a time as to convey the message of inferiority to minority students. *Ross v. Houston Independent School District,* 559 F.2d 937 (5th Cir. 1977); *United States v. Hinds County School Board, et al.,* 560 F.2d 1188 (5th Cir. 1977).

### VI. *Change in Student Composition*

Since the total student population of FBISD, 14,621 students, is currently more than fifteen times greater than the projected enrollment of SMSD the withdrawal of 924 Stafford students from FBISD does not substantially alter the statistics reflecting the racial composition of the remaining student population in FBISD. The effects of that withdrawal, however, are much more substantial than that narrow statistical view would indicate.

The resulting SMSD would be a school district of a very different racial composition. The great majority of black students living in the far eastern portion of FBISD, would be geographically excluded from the new district. SMSD's black population would be only 2.59% of its total student population where blacks currently make up 12.12% of FBISD. The percentage of Mexican-American students currently enrolled in FBISD would nearly double in the new district from 18.67% to 35.28%. This substantial disparity in the ratio of Mexican-American and black students between the old and new district will effect the continuing process of desegregation in FBISD.

> While pupil percentages alone are not controlling, where the disparity between old and new districts is substantial, the effect on achievement of court-ordered desegregation becomes axiomatic.

*Ross,* supra at 944.

At the hearing before the court Stafford contended that this case was somehow distinguishable from *Emporia* on the basis that FBISD was not under the compulsion of *court-ordered* desegregation. Rather, the Board voluntarily submitted a plan which was ultimately approved by the Department of Health, Education and Welfare, and FBISD has been operating under this plan ever since.

The fact of FBISD's voluntary participation in the dismantling of its dual school system in no way diminishes FBISD's constitutional obligation to do so, as mandated by the Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Court in *Green v. School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) charged "[s]chool boards . . . then operating state-compelled dual systems . . . with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." The Board of Trustees of FBISD is clearly so charged. In *United States v. Scotland Neck City Board of Education, et al.,* 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972) decided the same day as *Emporia,* Halifax County was not under a court-ordered desegregation plan. There the "parent" school district had entered into an agreement with the United States Department of Justice to implement a plan designed to dismantle its dual school system. Though the context of *Emporia* and many other cases is that the "parent" district was under a court-ordered desegregation plan, there is no language in those opinions which limits this court from deciding the issue because FBISD chose to voluntarily comply with the law. Any assertion by Stafford that the posture of this case is altered by that fact is without merit.

The substantial disparity in racial composition between FBISD and SMSD is not the only racial shift to be expected in the area if SMSD becomes operational. This court cannot ignore the fact that at least some residents of Sugar Land are interested in pursuing the prospect of carving out their

own school district. One effect of allowing SMSD to break away from FBISD is to encourage other communities, like Sugar Land, within FBISD and other "parent" districts to do likewise.

In addition to the real possibility of Sugar Land following the path of SMSD, Stafford's withdrawal from FBISD will severely disrupt the progress FBISD has made in dismantling and removing the effects of a dual system. The process FBISD chose is one which requires it to redraw its school attendance zones each time a new school is constructed in order to maintain the necessary racial balance in its neighborhood schools. To accomplish this task in view of the rapid residential growth in the area, FBISD has been planning five to six years in advance for the placement of new schools. Not only will the operation of SMSD obstruct implementation of planned construction, site selection, and attendance zones, but it will also restrict FBISD's future implementation of its desegregation plan. SMSD's location in the north central portion of FBISD, will create a physical barrier to future site selection and racial balance in attendance zones throughout FBISD.

The importance of site-selection and plans for further school construction cannot be minimized. The result of decisions made by the school board in this regard and with regard to the technique of student assignment it employs "will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The Court in *Swann* noted the use of site selection as a weapon for creating and maintaining a dual system. Indeed the placement of new schools

> may well promote segregated residential patterns which, when combined with 'neighborhood zoning', further lock the school system into the mold of separation of the races. . . . In devising remedies where legally imposed segregation

has been established, it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system.

*Swann,* supra at 21, 91 S.Ct. at 1278.

As the Fifth Circuit noted in *United States v. Hinds County School Board,* supra at 1191,

> The process of desegregation is not a static process with lines and markers once set being fixed for all time. Instead the process is often one of trial and error; if one set of zones proves ineffective, then another must be drawn and, if necessary, another, or some yet different approach be tried. The question here is whether by creating a separate school district whose lines were not subject to this ongoing process, the . . . [new district] "hinders or furthers the process of school desegregation." *Emporia, supra,* 407 U.S. at 460, 92 S.Ct. at 2202.

If SMSD is allowed to become operational, the process of desegregation can only be hindered by the sudden interjection into FBISD of a new school district with a totally different racial composition whose lines are no longer subject to that ongoing process.

### VII. *Changes In Education Quality*

The facts in the instant case do not support a finding that Stafford, by operating its own school system will improve the quality of education for the students residing in Stafford. The court found, *supra,* that there was no dissatisfaction with the quality of education provided students in FBISD. To the contrary, all evidence presented to the court supports a finding that FBISD offers quality education, however that term is variously defined by educators and/or parents.

Stafford does not press any claim to the educational facilities owned and operated by FBISD that are located within the boundaries of Stafford. At the present time Stafford has no buildings which it contemplates using now or in the future as

school facilities. It employs no teachers or administrative personnel and has merely a vision of a central school and civic complex embodied in an architect's rendering. In fact, Stafford desires FBISD to continue educating its students for at least two years since it would take at least that long to provide facilities and personnel. Stafford contemplates financing and building this educational complex in stages. Should FBISD not choose to continue educating Stafford students, SMSD would have to purchase or lease temporary facilities which would require "considerable disruption" of the education of these students. *Stafford Municipal School District, A Consultants Report*, p. 37, Defendant's Exhibit 35. It will take an undetermined number of years before SMSD can even hope to provide education for its students that approaches the quality now offered by FBISD.

Any argument advanced by Stafford that one of its purposes in seeking to operate its own school district is to provide a superior quality of education for its students than they are now receiving from FBISD is not at all persuasive in light of the facts and circumstances presented here.

Stafford advances the further consideration that its citizens lack control over the operations of FBISD. Uncontroverted testimony at the hearing before this court established that until recently a citizen of Stafford was a member of the Board of Trustees of FBISD for ten years. This court recognizes the desire of Stafford citizens to have direct control over decisions which vitally affect the education of their children as well as the expenditure of their tax money. However, the evidence supports a finding that Stafford citizens have had such control through representation on the Board of Trustees, and there is no reason to suspect they will be prevented in any way from exercising such control in the future, should they choose to do so.

While Stafford purports to represent the interests of less than one-fifteenth of the students in FBISD, should SMSD become operational it will substantially diminish the quality of the total educational program for all students remaining in FBISD. As a direct result of the operation of SMSD, FBISD will lose a substantial amount of the commercial based tax revenue it must have to provide the quality of education it offers to all students.

The educational programs funded by local taxes such as the technical, occupational and career programs, directly benefit a substantial portion of the minority students. The same revenue source is used to provide transportation for students from outlying areas who participate in those programs offered after school hours. As stated earlier in this opinion, the majority of black students reside in the far eastern section of the district and rely solely on this transportation to participate.

Since it embarked on dismantling its dual educational system FBISD has offered more in the way of quality education than the barest minimum requirements. In effectuating the Supreme Court's charge to eliminate racial discrimination "root and branch", FBISD using all its resources undertook a complete program of education to meet the needs of all its students. The withdrawal of Stafford would mean a loss to FBISD of 14.6% of its commercial tax base. While FBISD will continue to provide quality education that quality will significantly and immediately diminish. The continuing increase in residential growth will bring more students into FBISD. Taking into consideration the additional residential tax revenue generated by these new homes, FBISD must generate an additional $234.00 to educate each new child coming into the system. Since its per pupil cost is not met by residential taxes FBISD relies on commercial tax revenue to make up the difference. A substantial portion of that commercial tax base lies in Stafford. Stafford's contention that FBISD will quickly make up for the lost revenue since it is growing so rapidly is simply not the case. Rapid residential growth means FBISD must generate more non-residential tax revenue for each additional child in order to maintain the quality of education it now offers. The implementation of SMSD will

sharply diminish that revenue source and thus directly diminish the quality of education offered by FBISD.

█ While students in a formerly segregated school system are not, by virtue of that fact, constitutionally entitled to a superior quality education, the constitutional mandate to eliminate racial discrimination and its effects is broad enough to protect a school district engaged in that process from the undermining effects of a breakaway district whose operation will diminish the quality of education for all students in the area and not provide better education for any of them.

## VII. *Timing*

The Court in *Emporia* lists as a third factor for this court's consideration whether the creation of the new school district comes at such a time as to have an adverse psychological effect on the minority children remaining in the parent district. *Emporia, supra,* 407 U.S. pp. 465–466, 92 S.Ct. 2196. Since there was no evidence directed to this issue, the court will not speculate as to what if any adverse psychological effect the operation of SMSD would have on minority students. The court does not find that the *timing* of Stafford's attempt to operate its own school district would have any adverse effect other than that noted above regarding student composition and educational quality.

## *Conclusion*

In 1965 Fort Bend Independent School District began the process of desegregation. In the ensuing years FBISD has consistently and continuously applied its plan for eliminating both the existence and effects of its former dual system and at the same time has provided a quality education for the students attending the FBISD schools. In rapidly growing areas such as the area within the boundaries of FBISD, attempts to maintain an integrated school system and to eliminate racial discrimination root and branch in the schools is a continuing process. Whatever might be the motives of the residents of the City of Stafford, their efforts to carve out their own school district, as has been pointed out, would severely hinder the continuing efforts of FBISD.

█ The mandate of the Supreme Court of the United States in this area imposes an obligation upon the trial courts when presented with such problems as this to carefully scrutinize efforts of so-called "break-away" school districts to determine the effect of such upon the efforts of the existing school district to achieve an integrated school system while at the same time providing quality education for its students. This mandate has been followed by the Fifth Circuit in *United States v. State of Texas,* supra, at 443–444:

> Defendants [the State of Texas] shall not permit, make arrangements for, approve, acquiesce in, or give support of any kind to changes in school district boundary lines—whether by detachment, annexation, or consolidation of districts in whole or in part—which are designed to, or do in fact, create, maintain, reinforce, renew, or encourage a dual system based on race, color, or national origin.

A close and critical look at the evidence presented in this case leads this court to the conclusion that efforts of the Stafford Municipal School District to break away from the Fort Bend Independent School District would be in direct violation of that mandate as it applies to FBISD.

This Memorandum Opinion constitutes this court's findings of fact and conclusions of law. Counsel for the Fort Bend Independent School District shall, within thirty (30) days submit a judgment consistent with this Memorandum Opinion, said judgment to be approved by all counsel as to form.