FORT BEND INDEPENDENT SCHOOL DISTRICT et al., Plaintiffs,

v.

The CITY OF STAFFORD et al., Defendants.

Civ. A. No. H–77–1752.

United States District Court,
S. D. Texas,
Houston Division.

May 12, 1980.

Michael K. Swan, Chris Butler, Reynolds, Allen & Cook, Houston, Tex., for plaintiffs.

William A. Olson, Olson & Olson, Houston, Tex., Charles L. Michulka, City Atty., Stafford, Tex., for defendants.

## MEMORANDUM AND FINAL ORDER

SINGLETON, Chief Judge.

The Fort Bend Independent School District (FBISD), students of FBISD, and parents of students of FBISD brought this action pursuant to 42 U.S.C. § 1983 and the fourteenth amendment to permanently enjoin the City of Stafford from breaking away from FBISD to operate a municipal school district independent of FBISD. A trial occurred and judgment was entered by this court enjoining Stafford from breaking away from FBISD.[1] Stafford appealed. The Court of Appeals for the Fifth Circuit reversed this court's decision and remanded the case.[2] The fifth circuit ruled that

FBISD's achievement of unitary status is a condition which must be met before Stafford may break away. The circuit court stated that the "[c]reation of a separate school district which will impede the dismantling of a segregated system," whether operating under court order or not, "will be enjoined." 594 F.2d at 74. However, where a district has achieved unitary status, the break away should not be enjoined. The court wrote,

> Creation of a new district is not a constitutional violation, however, merely because at some time in the past the parent district engaged in discrimination. Once a district achieves unitary status, the methods, means and procedures employed to reach that status are not frozen and unchangeable, immunized from the consequences of subsequent racially neutral attempts to alter or divide the district.

594 F.2d at 74–75.

The circuit court ruled that "the district court walked a narrow line between deciding whether unitary status has or has not been attained." 594 F.2d at 76. The appellate court quoted portions of this court's opinion which suggested that FBISD had not achieved unitary status. The fifth circuit noted that despite such suggestions, "the [district] court made no express findings that constitutional violations remain uncorrected, and the parties are not able to point out to us hard evidence that would justify our making such a finding at the appellate level." 594 F.2d at 76. The circuit court also referred to portions of this court's opinion which suggested that FBISD already achieved unitary status. The circuit court concluded that this court did not determine whether or not FBISD achieved unitary status. It remanded the case for an unequivocal finding on that issue.

In *Green v. County School Board of New Kent Co., Va.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court first characterized school systems as "dual" or "unitary," according to their racial status in six major areas.

1. 449 F.Supp. 375 (S.D.Tex.1978).

2. 594 F.2d 73 (5th Cir. 1979).

Racial identification of the system's schools was complete, extending not just to the composition of student bodies at the two schools but to every facet of school operations-faculty, staff, transportation, extracurricular activities and facilities. In short, the State, acting through the local school board and school officials, organized and operated a dual system, part "white" and part "Negro" 391 U.S. at 435, 88 S.Ct. at 1693.[3] *Green's* six criteria must be considered in an inquiry into the status of a school district that is intentionally racially segregated on a de facto basis.[4] They also apply where a school district is segregated along ethnic lines.[5]

One component of a unitary system is an integrated faculty. Whether the faculty of a school district has achieved unitary status is a two pronged inquiry. First, the minority teachers must be evenly distributed throughout the system. In *U. S. v. Greenwood Municipal Separate School District,* 406 F.2d 1086, (5th Cir. 1969), the fifth circuit firmly stated that,

> The school board must put its shoulder to the wheel and assume the burden of integrating the faculty and staff of each school.... The transformation to a unitary system will not come to pass until the board has balanced the faculty of each school so that no faculty is identifiable as being tailored for a heavy concentration of Negro or white students.

406 F.2d at 1093–1094. *See also, Singleton v. Jackson Municipal Separate School District, supra* note 3, at 1217–1218; *Cisneros v. Corpus Christi Independent School District, supra* note 5.

The second prong of the inquiry is an examination of the percentage of minority teachers in the district. The faculty must reflect the racial and ethnic composition of the students. In *U. S. v. Texas Education Agency, supra* note 5, the fifth circuit considered the school desegregation plan for the Austin Independent School District. The school district was 65% white, 20% Mexican-American, and 15% black. Only three percent of the total faculty was Mexican-American. The plan integrated white and black students, but omitted integration of the Mexican-American students. The plan also did not seek to improve the percentage of Mexican-American faculty. The court of appeals ruled that the omission of Mexican-American students from the integration plan violated the Equal Protection Clause of the Fourteenth Amendment. 467 F.2d at 852, 862–870. The court also ruled that, "The school board ... should attempt to employ more Mexican-American teachers with the goal of attaining a ratio of Mexican-American teachers within the faculty that reflects more truly the ratio of Mexican-American students to the total population." 467 F.2d at 873.[6]

3. *See also Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18–19, 91 S.Ct. 1267, 1277–1278, 28 L.Ed.2d 554 (1971); *Singleton v. Jackson Municipal Separate School District,* 425 F.2d 1211 (5th Cir. 1970); and *Ellis v. Board of Public Instruction of Orange County, Fla.,* 423 F.2d 203 (5th Cir. 1970).

4. *See, Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 226, 93 S.Ct. 2686, 2706, 37 L.Ed.2d 548 (1973) (Powell, J., concurring); *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).

5. *See, U. S. v. Texas Education Agency,* 467 F.2d 848, 852 (5th Cir. 1972) (en banc), 564 F.2d 162 (5th Cir. 1977) (involving Mexican-Americans and whites); *see also, Cisneros v. Corpus Christi Independent School District,*

459 F.2d 13 (5th Cir. 1972); *Alvarado v. El Paso Independent School District,* 445 F.2d 1011 (5th Cir. 1971).

6. *See also, Morgan v. Kerrigan,* 530 F.2d 431 (1st Cir. 1976), in which the second circuit approved a Boston desegregation plan requiring one black teacher to be hired for each white teacher hired until 20% of the permanent teachers were black, the approximate percentage of blacks in the population of Boston; *McPherson v. School District # 186, Springfield, Illinois,* 426 F.Supp. 173 (S.D.Ill.1976); *Arvizu v. Waco Independent School District,* 373 F.Supp. 1264, 1271 (W.D.Tex.1973), rev'd. in other respects, 495 F.2d 499 (5th Cir. 1974). *But see, Horton v. Lawrence,* 320 F.Supp. 790 (N.D.Ala.1970), rev'd. on other grounds, 449 F.2d 793 (5th Cir. 1971), in which the circuit court modified an order which had, in effect, imposed a quota system of hiring black teach-

■ In summary, in order to achieve unitary status a school district must be fully integrated in six respects: faculty, staff, student bodies, facilities, extra-curricular activities, and transportation. In the area of faculty composition, two considerations are significant: the minority teachers must be evenly distributed throughout the district, and the percentage of minority faculty must be approximately the same as the percentage of minority students.

In this case, the plaintiffs and Stafford stipulated that FBISD achieved unitary status in four of the six critical areas; they dispute FBISD's status in the areas of faculty and staff composition. The plaintiffs' evidence pertains to certified personnel, i. e. all employees required to be certified by the Texas Education Agency, including administrators, teachers, principals, counselors, nurses, librarians, etc. The data illustrated that FBISD's 12.14% minority certified personnel are evenly distributed throughout the district, with a few, minor exceptions. (See Appendix I.)

The statistics reveal slight maldistributions of minority personnel throughout the district. Two schools have under 5% and one has 6% minority certified personnel, although the district has 12.14% minority certified personnel. Two schools have 14% or more black certified personnel, and two have under 3% black certified personnel, whereas the district has 8.6% black certified personnel. Three schools have no Mexican-American teachers, although Mexican-Americans make up 3.11% of the certified personnel.

■ In no instance is the percentage of minority personnel so high or so low that the school is identifiable as a minority or black school. The absence of Mexican-American certified personnel in several schools does not necessarily identify those schools as "white" or non-Mexican-American schools, given the low number of Mexican American personnel throughout the system. FBISD introduced no evidence to show that any of these schools are known as "white," "black," or "Mexican-American" schools, due to the composition of the faculty. Thus, the court finds that the slightly uneven distribution of certified personnel does not preclude unitary status in the areas of faculty and staff.

■ The low percentage of minority, Mexican-American and black certified personnel throughout the system does raise the pivotal issue of this case: the disparity in the percent of minority faculty compared with the percent of minority students.

FBISD employs a total of 117 minority certified personnel. Of these, 83 are black, 30 are Mexican-American, and 4 "other." Altogether, they comprise a total of 12.14% of the certified personnel; the blacks represent 8.6% of the certified personnel, the Mexican-Americans represent 3.11%, and "others" represent 0.43%.

A comparison of the percentage of minority certified personnel with the percentage of minority students shows a disproportionately low percentage of minority personnel. As of December 27, 1979, approximately 36% of FBISD's student population were minority students, including blacks, Mexican-Americans, and others.[7] Blacks comprised 16.11% of the student population, Mexican-Americans 17.2% and others 2.42%. (See Appendix II.) The difference between the percent of minority certified personnel and students is 23.59%. Breaking it down into ethnic and racial groups, there is a 14.09% disparity between the percent of Mexican-American students and Mexican-American certified personnel. This is the most severe disparity. There is a 7.51% disparity between the percent of black students and black certified personnel. Although not as dramatic as the difference for Mexican-Americans, it is still significant. (See Appendix II.)

The low percentage of minority certified personnel in FBISD indicates that FBISD has not yet achieved unitary status in the areas of faculty and staff composition.

ers to reach the proper percentage of minority faculty.

**7.** Exhibit attached to Report of Amicus Curiae at 1, 2.

Consequently, FBISD is not yet a unitary school district and Stafford is enjoined from breaking away from FBISD to form its own school district.

This court with all deference again repeats all of the matters contained in its original memorandum opinion,[8] and for the purpose of emphasizing its concern on this subject repeats the conclusions reached originally in this case.

In 1965 Fort Bend Independent School District began the process of desegregation. In the ensuing years FBISD has consistently and continuously applied its plan for eliminating both the existence and effects of its former dual system and at the same time has provided a quality education for the students attending the FBISD schools. In rapidly growing areas such as the area within the boundaries of FBISD, attempts to maintain an integrated school system and to eliminate racial discrimination root and branch in the schools is a continuing process. Whatever might be the motives of the residents of the City of Stafford, their efforts to carve out their own school district, as has been pointed out, would severely hinder the continuing efforts of FBISD.

The mandate of the Supreme Court of the United States in this area imposes an obligation upon the trial courts when presented with such problems as this to carefully scrutinize efforts of so-called "break away" school districts to determine the effect of such upon the efforts of the existing school district to achieve an integrated school system while at the same time providing quality education for its students. This mandate has been followed by the Fifth Circuit in *United States v. State of Texas, supra,* at 443–444:

> Defendants [the State of Texas] shall not permit, make arrangements for, approve, acquiesce in, or give support of any kind to changes in school district boundary lines—whether by detachment, annexation, or consolidation of districts in whole or in part—which are designed to, or do in fact, create, maintain, reinforce, renew, or encourage a dual system based on race, color, or national origin.

A close and critical look at the evidence presented in this case leads this court to the conclusion that efforts of the Stafford Municipal School District to break away from the Fort Bend Independent School District would be in direct violation of that mandate as it applies to FBISD.

For all the reasons stated herein and in its original opinion, this court finds that the defendants, City of Stafford, et al., should be enjoined from breaking away from the Fort Bend Independent School District to form its own municipal independent school district.

Therefore, it is hereby ORDERED, ADJUDGED and DECREED that the plaintiffs, Fort Bend Independent School District, et al's application for a Permanent Injunction be, and the same is GRANTED.

## APPENDIX I

### ETHNIC DISTRIBUTION OF CERTIFIED PERSONNEL (1979–80)

| SCHOOL | NUMBER AND PERCENTAGE MEXICAN–AMERICAN CERTIFIED PERSONNEL | NUMBER AND PERCENTAGE BLACK CERTIFIED PERSONNEL | TOTAL NUMBER AND PERCENTAGE MINORITY INCLUDING MEXICAN–AMERICAN BLACK AND OTHER |
|---|---|---|---|
| Elementary | | | |
| E. A. Jones | 1 (2%) | 2 (4%) | 3 (6%) |
| Lakeview | 3 (6.82%) | 3 (6.82%) | 6 (13.64%) |
| Blue Ridge | | 3 (8.11%) | 3 (8.11%) |

8. 449 F.Supp. at 384.

ETHNIC DISTRIBUTION OF CERTIFIED PERSONNEL (1979–80)

| SCHOOL | NUMBER AND PERCENTAGE MEXICAN–AMERICAN CERTIFIED PERSONNEL | | NUMBER AND PERCENTAGE BLACK CERTIFIED PERSONNEL | | TOTAL NUMBER AND PERCENTAGE MINORITY INCLUDING MEXICAN–AMERICAN BLACK AND OTHER | |
|---|---|---|---|---|---|---|
| Elementary | | | | | | |
| Meadows | | | 3 | (6.67%) | 4 | (8.89%) |
| Ridgemont | 2 | (5.00%) | 4 | (10.00%) | 6 | (15%) |
| Quail Valley | 4 | (7.41%) | 2 | (3.70%) | 6 | (11.11%) |
| Dulles | 1 | (2.22%) | 1 | (2.22%) | 2 | (4.44%) |
| Briargate | 2 | (4.00%) | 7 | (14.00%) | 9 | (16.00%) |
| Townewest | 1 | (2.38%) | 1 | (2.38%) | 2 | (4.76%) |
| Lantern Lane | | | 5 | (10.87%) | 5 | (10.87%) |
| Junior High School | | | | | | |
| Sugarland | 4 | (5.06%) | 7 | (8.86%) | 12 | (15.18%) |
| Missouri City | 3 | (3.85%) | 7 | (8.97%) | 10 | (12.82%) |
| Quail Valley | 5 | (6.76%) | 3 | (4.05%) | 8 | (10.81%) |
| High School | | | | | | |
| Willowridge | 1 | (1.60%) | 9 | (14.80%) | 10 | (16.40%) |
| Dulles | 3 | (1.43%) | 26 | (12.44%) | 31 | (14.35%) |
| TOTAL 15 Schools | 30 | (3.11%) | 33 | (8.6%) | 117 | (12.14%) |

Based on Plaintiffs' Exhibits Nos. 53, 100–115 (on remand).

## APPENDIX II

ETHNIC DISTRIBUTION OF STUDENT POPULATION (1979–80)

| | White | | Mexican-American | | Black | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Elementary | 5657 | (60.76%) | 1738 | (18.67%) | 1607 | (17.26%) | 307 | (3.29%) | 9309 | (100%) |
| Jr. High School | 2684 | (65.03%) | 712 | (17.25%) | 661 | (16.01%) | 70 | (1.69%) | 4127 | (100%) |
| High School | 3278 | (70.61%) | 659 | (14.19%) | 644 | (13.87%) | 61 | (1.31%) | 4642 | (100%) |
| | 11619 | (64.27%) | 3109 | (17.20%) | 2912 | (16.11%) | 438 | (2.42%) | 18078 | (100%) |

Based on Plaintiffs' Exhibits Nos. 79, 84 and 89 (on remand).